## In re BARBER et al.

(District Court, D. Minnesota, Fourth Division. September 25, 1899.)

### No. 22.

1. BANKRUPTCY—FEES OF REFEREE.

The compensation of a referee in bankruptcy is fixed by the statute, and will not be abated or diminished in a particular case because some of the duties which ordinarily would be discharged by the referee, in the holding of hearings and making of orders, were assumed by the judge, at the request of the parties, on account of the magnitude of the interests involved, and the unusual character of the proceedings.

2. SAME—"DIVIDENDS" IN BANKRUPTCY.

A "dividend" in bankruptcy is a parcel of the fund arising from the assets of the estate, rightfully allotted to a creditor entitled to share in the fund, whether in the same proportion with other creditors, or in a different proportion.

3. SAME—PAYMENT OF SECURED DEBT AS DIVIDEND—COMMISSIONS.

Where real property of a bankrupt, incumbered by a mortgage securing a series of bonds in the hands of different holders, is sold by the trustee free of liens, pursuant to an order of the court of bankruptcy on the petition of the trustee and of the secured creditors, and the avails of sale brought into court for distribution, that portion of the proceeds which is paid over by the trustee to each bondholder, in satisfaction of his debt, is a "dividend," within the meaning of Bankr. Act 1898, §§ 40, 48, providing for the compensation of referees and trustees in bankruptcy by commissions on "sums to be paid as dividends."

4. SAME.

While a secured creditor may ordinarily collect his debt by foreclosure or sale, as if no bankruptcy were pending, yet if, without his request, and solely to realize a surplus for other creditors, the court directs sale of the property discharged from the incumbrance, his rights must be conserved; and the satisfaction of his secured debt from the proceeds of such sale may not be regarded as a dividend, nor charged with commission.

In Bankruptcy. On objections to final account of trustee in bankruptcy.

Keith, Evans, Thompson & Fairchild, for bankrupts.

Fred. B. Snyder, in pro. per.

Gilfillan, Willard & Willard, for Hennepin Land Co. and First Nat. Bank of Minneapolis.

W. C. Tiffany, for Trenton Banking Co.

Cross, Hicks, Carleton & Cross, for First Nat. Bank of Hazelton, Pa.

W. J. Hahn, for Minnesota Loan & Trust Co.

LOCHREN, District Judge. In this case the principal assets of the bankrupts consisted of a large and valuable flouring-mill property, and other improved and income-producing real estate, in the city of Minneapolis, upon which the bankrupts had on June 1, 1893, executed a mortgage (which was duly recorded) to the Min-

nesota Loan & Trust Company, as trustee, to secure the payment of bonds of the same date, payable to said trustee or bearer, of the denomination of $1,000 each, to the amount of $542,000, which constituted the principal indebtedness of the bankrupts. The petition in bankruptcy was filed August 27, 1898. At the first meeting of the creditors the bondholders appeared, and proved to the satisfaction of the referee that the value of their security did not exceed 26 per cent. of the amount of their claims; and, to enable them to participate in the creditors' meetings, their claims were allowed at 74 per cent. of the amounts of the same; and they constituted more than nine-tenths of the claims of creditors taking part in creditors' meetings. Fred B. Snyder was by the creditors appointed trustee in bankruptcy. Appraisers were appointed, and the entire estate was appraised at $177,208.54, including the real estate covered by said mortgage, which was appraised at $167,100. On May 6, 1899, the trustee in bankruptcy petitioned the court for leave to sell all the real estate of the bankrupt at public sale, including the sale of said mortgaged real estate free and clear from the lien of the mortgage. All the holders of said bonds appeared by their attorneys, and joined in asking the court to grant the petition of the trustee in bankruptcy; representing, as did the trustee, that the real estate covered by the said mortgage would sell for better prices at such absolute sale than could be obtained by foreclosure of the mortgage and by separate sale of the equity of redemption, and that the whole matter could thus be closed and disposed of in brief time, to the advantage of everybody. The petition was therefore granted, and an order made directing the sale of all of said real estate, free and clear from the lien of said mortgage, at public auction, in parcels, after prescribed notice, and providing, among other things, that any purchasers of any real estate covered by said mortgage should "be entitled to a credit upon the purchase money to the aggregate amount of the dividends which will be payable out of the same upon any of said bonds or coupons then held by said purchaser or purchasers, upon indorsements thereof upon such bonds and coupons, respectively." It was further ordered that the proceeds of such sale be brought into court, and thereupon the lien of the said trust deed should attach to so much thereof as should remain after the court should ascertain and determine the value of the equity of redemption, and set the same apart for the general creditors. The sale was accordingly made by the trustee in bankruptcy, and confirmed by the court, which also determined and set apart for the general creditors the value of the equity of redemption in the real estate covered by the mortgage, and satisfied and canceled said mortgage. Every detail was agreed to by all the parties concerned. The mortgaged real estate sold for sums aggregating, in the whole, $139,500, including the equity of redemption, valued at $7,722.18, leaving for division among the bondholders $131,777.82. Other amounts were realized by the trustee from the estate, so that after payment of expenses of administration, aside from commissions to the referee and trustee, there remained for distribution to general creditors, including

the value of the equity of redemption aforesaid, $12,524.46. Among the purchasers of the said mortgaged real estate was the Hennepin Land Company, which was the owner of said bonds to the amount of $492,000, and which purchased, of the same real estate, parcels, the purchase price of which amounted to $82,500, upon which it was credited with its dividend on said sum of $131,777.82, $68,-696.32, and paid in cash to the trustee $13,803.68. The final report of the trustee shows the amounts upon which commissions to the referee and trustee are to be computed, as follows:

Amount realized (less value of equity of redemption) from sale of the mortgaged property, and payable to the bondholders pro rata ............................................................. $131,777 82
Amount for division to general creditors....................... 12,524 46

$144,302 28

And his report allows as commission to be paid to Orlando C. Merriman, as referee, $1,443.02, or 1 per cent. upon the aggregate amount applicable to dividends to the secured bondholders and to the general creditors, and from which to pay the commissions. The allowance of this commission to the referee is objected to by the Hennepin Land Company, the creditor holding the largest amount of the said bonds, on the claim that neither the referee nor trustee is entitled to any commission on the moneys realized from the sales of the mortgaged real estate for the benefit of the bondholders, because of their mortgage lien or security, and that the commissions of the referee should only be $125.24, or 1 per cent. on the amount to be divided among the unsecured creditors. It contends, further, that in any event the referee is not entitled to commission upon the sum of $68,696.32, being the dividend of the Hennepin Land Company as holder of bonds upon the sum of $131,-777.82 produced by the security, and which sum of $68,696.32 said Hennepin Land Company was credited upon its purchase of mortgaged real estate upon indorsing the same as payment upon its bonds. and no part of which, therefore, actually passed through the hands of the trustee in bankruptcy.

The hearing on the applications above mentioned might have been had before the referee, and all the orders aforesaid could have been made by him; and the fact that the judge, at the request of the parties, and because of the large amount involved, and the unusual character of the proceeding, consented to act in some matters where the referee might have acted, in no way affects the right of the referee to commissions. His commissions are fixed absolutely by the terms of the act, and cannot be increased, however inadequate they may appear in view of the amount of services actually performed by the referee, nor diminished in the rare cases where they may seem to afford a very generous compensation for such services. The commissions of referees are fixed by section 40 of the act, which provides that they shall have "from estates which have been administered before them one per centum commissions on sums to be paid as dividends and commissions." The commissions of trustees are by section 48 of the act based up-

on the same "sums to be paid as dividends and commissions." It is apparent, therefore, that in any case the commissions of the referee and of the trustee are to be computed on the same identical sums. The contention here arises upon a dispute as to the proper construction and meaning of the word "dividends," as used in the above-quoted clauses of the act. The objecting creditor insists that a dividend, within the meaning of the law, is declared and paid on unsecured claims only (citing In re Ft. Wayne Electric Corp. [D. C.] 94 Fed. 109), while the referee urges that all moneys paid upon any claims of creditors which have been voluntarily submitted, by the creditors holding the same, for payment by and through the administration of the estate in the court of bankruptcy, are paid as dividends. The word "dividend" is a business term, applied to the division among stockholders of a fund arising from profits, or to the division among creditors of an insolvent of the fund arising from the assets of the insolvent's estate. In either case it is the fund that is divided and parceled out among those who are entitled, and the part of the fund so allotted to a stockholder or creditor is his dividend. Dividends upon profits may be apportioned at one rate to the holders of preferred stock, and at another rate to the holders of common stock. So, in insolvency, a creditor having priority may be paid in full, yet such payment is just as certainly his dividend or share of the fund as is the small percentage on his claim which the general creditor may receive from the same fund; and, unless there is something in the act requiring a different holding, the referee and trustee are entitled to commissions upon all such dividends. If the word "dividend" could be construed as applying to a division of the debts, so that such commissions are to be allowed only in respect to such debts as are divided by being paid only in part, then, in a case like In re Sabine, 1 Nat. Bankr. News, 312, where, by good management of the referee and trustee, every claim was paid in full, these officers would be entitled to no commissions. A dividend in bankruptcy is a parcel of the fund arising from the assets of the estate, rightfully allotted to a creditor entitled to share in the fund, whether in the same proportion with other creditors, or in a different proportion. I think I have indicated the general understanding of the meaning of the word "dividend," and I fail to discover anything in the act tending to show that it is used in any different sense. Section 64, relating to debts which have priority, strengthens my conclusion. That provides that the trustee shall pay all taxes "in advance of the payment of dividends to creditors." This would exclude taxes from the category of dividends, but nothing else. The payment of debts having priority are payments to creditors from the fund arising out of the assets, of the amounts to which they are entitled, severally,—to each his proper dividend of the fund, under the terms of the act. Debts having priority must be examined by the referee upon proofs, and allowed or disallowed like other claims. It might happen that, after the payment of debts of the three first classes having priority, the remainder of the fund will be insufficient to pay in full the wages of workmen,

clerks, and servants of the fourth class, and that the referee must ascertain the dividends that can be paid to creditors having priority of that class by a per centum computation. In all cases he must ascertain and declare the dividends to be paid to creditors having priority, as well as to others, and put them all upon the "dividend sheets" which he must deliver to the trustee as required by the first clause of section 39. These dividend sheets constitute the trustee's only warrant for paying money to any creditor. Section 57*l*, providing that "whenever a claim shall have been reconsidered and rejected in whole or in part, upon which a dividend has been paid, the trustee may recover from the creditor the amount of the dividend received upon the claim if rejected in whole, or the proportional part thereof if rejected only in part," is just as applicable to claims of a class having priority as to claims of any other kind, and supports the construction I have given to the word "dividend" as employed in the act. As before suggested, the misconstruction of this word seems to have arisen from the mistaken idea that the word "dividend," instead of relating to a division of the fund according to the rights of the several creditors, of whatever classes, has some fanciful relation to such of the debts as are not paid in full. But the fund is the thing which is divided, and the dividends are the parcelings to the creditors from that fund. Section 65a, which is usually referred to as supporting the idea that payments to unsecured creditors having no priority are the only dividends contemplated by the act, does not purport to cover all dividends, but only directs how the dividends of that part of the fund applicable to the one general class of claims having neither priority nor security shall be computed, declared, and paid. The provisions of the other subdivisions of the same section (65) are applicable only to dividends to that same general class of creditors, as the matter of dividends to creditors whose claims have priority is fully covered by the provisions of the preceding section (64). That the word "dividend" had in the act of 1867 the meaning here claimed for it is very obvious. Rev. St. U. S. §§ 5101, 5102. Had the congress intended that the word should have a different meaning in the act of 1898, that intention would have been plainly expressed, as it is well understood that, in construing statutes, reference to other statutes on the same subject affords the most reliable aid.

Having ascertained the scope and meaning of the word "dividend" as employed in this act, it remains to be considered whether, in the administration of an estate in bankruptcy, there may be circumstances under which payments to secured creditors of moneys coming into the hands of the trustee, and into the referee's accounts of the estate, upon sale by the trustee, agreeably to orders of the court of bankruptcy, of the property pledged or mortgaged, —the moneys being paid to the secured creditors as the avails realized from their securities,—can or ought to be treated and regarded as "dividends." in respect to which rights to commissions in favor of the referee and trustee attach. While the act is intended to enforce the payment of debts having priority, as well

as general unsecured debts, through the administration of estates of insolvents in courts of bankruptcy, it is not framed with any special view to the enforcement of the securities for the benefit alone of the secured creditors. Nor does it seem to contemplate the interference with or any enforcement of such securities by the trustee, or upon his motion alone, except for the purpose of realizing from the property pledged or mortgaged some moneys, which, after discharging the incumbrance, will go into the fund arising from the general assets, and benefit the unsecured creditors, whether entitled to priority or not. The trustee may, by order of the court of bankruptcy, pay off the incumbrance, or sell the property subject to the incumbrance; or, if the conservation of equitable rights require such action, the same court has doubtless the power to order the absolute sale of the property free from and discharged of the incumbrance, taking care of the rights and equities of the secured creditors in the disposition of the moneys realized by such sale. Ordinarily a secured creditor may, at his option, refrain from invoking the assistance of the court of bankruptcy, and proceed to collect his debt from the securities, by sale, foreclosure, or other procedure conformable to law and to the contract, as if no bankruptcy was pending, and then, if a portion of the debt remains unsatisfied, it may be proved and allowed as an unsecured debt. Or, if the security is inadequate, he may, without enforcing it, have its value ascertained in one of the other ways indicated in the act, and, such value being treated as a credit, have the balance of his claim allowed, and receive his dividends thereon. If a secured creditor refrains from asking or invoking the aid of the court of bankruptcy to enable him, through its officers and its exercise of jurisdiction, to turn his securities into cash, then, although the court, for the benefit of the unsecured creditors, should use its equitable power to the extent of selling the incumbered property free and discharged of the incumbrance, assuming to care for the equitable rights of the secured creditor in its disposition of the moneys arising from the sale, there would seem to be reason for holding that the moneys going to the secured creditor under such circumstances only came into the case incidentally, as the result of the effort to realize and obtain other money for the unsecured creditors, and that it should not be regarded as any dividend, or charged with any commissions. It is doubtless true, and for obvious reasons, that, in all cases where improved real estate is mortgaged, the amount for which it can be sold on foreclosure, subject to the year's equity of redemption before the purchaser can have possession, added to what that equity of redemption will produce if sold separately, will not equal the amount for which the same property can be sold if full title and possession can be given at once. This is especially true where, as in this case, the principal real estate covered by the mortgage is a large and extensive flouring mill, with all the modern machinery and appliances for the manufacture of flour in such quantity that the principal markets of the world must be canvassed for its sale. Purchasers at a foreclosure sale only would not know whether they would get the mill

or redemption money at the end of the year following the sale, nor to what extent the property, by careless usage and want of repair, might deteriorate in that time. A separate sale of the equity of redemption would be measurably unproductive, as no one could easily forecast the result of investing the necessary capital and making the arrangements for carrying on such a business, if it must close at the end of one year. In this case the secured creditors,—the bondholders,—in their own interest. sought and invoked the aid of the court of bankruptcy in the making of this sale, whereby they realized upon their security more than they could have expected through foreclosure, and without the expense and delay of that remedy. Their equities were preserved, and by including the equity of redemption in the sale the best results were at the same time realized for the unsecured creditors. After determining and apportioning to the general fund of the estate that part of the proceeds of the sale which it was agreed fairly represented the equity of redemption, the remainder, as realized from the security, had to be apportioned and assigned to the several bondholders,—to each his dividend from that fund. The fact that in this case they agreed that the whole of that fund—the sum of all their dividends from it—should be paid to an agency of their own selection, for division and apportionment among them, made no difference. The special fund arising from the security was obtained, not by the action of the creditors converting the security into money according to the terms of the mortgage, and the law in respect to foreclosure, but through the jurisdiction of the court of bankruptcy, invoked for that purpose by the secured creditors, and under the orders and procedure of that court carried into effect by its officers, the referee and trustee. The payment of that fund to the parties entitled was the payment to each bondholder of his dividend of that fund upon his claim which had been proved and allowed. The fact that the Hennepin Land Company, as purchaser of parcels of the mortgaged property, was permitted to defer the payment of the purchase price until the "dividend" to which it was entitled as bondholder from the security fund was ascertained, and then allowed to receive that dividend by taking a credit for it on such purchase price, was a mere matter of convenient offset. It received in that way its dividend from that fund, precisely the same as if it had paid over the money on the purchase, and received it back as dividend. It is properly the basis of commission to the referee and trustee, whether paid the one way or the other. That arrangement rested entirely on the order of the court, even though its convenience may have been suggested by a provision contained in the mortgage. The sale of the property was in no sense a foreclosure of the mortgage, but an absolute sale of all rights in the property under the equity power of the court, exercised on the motion of all the interested parties, with the view of obtaining the most money the property would bring, for division among the creditors, secured and unsecured, according to their respective rights and equities. The provisions of the mortgage relative to proced-

ure in case of its foreclosure were wholly immaterial in respect to this sale.

The case of In re Slevin, 4 Dill. 131, Fed. Cas. No. 12,942, has no bearing. There the sale was made by the trustee named in the mortgage, and the assignee in bankruptcy, who would have been entitled to receive only any surplus after the payment of the mortgage debt, joined in the deed. But there was no surplus, no money whatever to be administered by the court of bankruptcy, and he was properly held entitled to no commission. Here the entire fund was obtained through the action of the court of bankruptcy, whose officers alone made the sale and administered the fund; paying the avails of the security directly to the bondholders, and entirely disregarding the trustee named in the mortgage. The mortgage was functionless in the proceeding, except as it showed the extent of the rights and equities of the bondholders which were entitled to the protection of the court. The payments to the bondholders were of their dividends or allotments of the fund produced in the court of bankruptcy through the execution of its orders by its officers upon the motion or request of the secured creditors, and the referee and trustee are entitled to commissions on such dividends. Such sale, when agreed to by all the parties, was doubtless within the equity powers of the court of bankruptcy. Ex parte Christy, 3 How. 292, 315. It enabled the mortgagees or bondholders to realize with greater speed the avails of the security than could have been done by foreclosure under the terms of the mortgage, and of the law under which the creditors might have acted. But there is nothing in the law which excludes the referee from commissions upon dividends to any class of creditors from a fund obtained through the action of the court alone, and the services of its officers, when such action and services have been invoked by such creditors. The commission of the referee is therefore allowed at the sum of $1,443.02, as stated in the final account filed by the trustee.