**VIRGINIA SECURITIES CORPORATION v. PATRICK ORCHARDS, Inc., et al. BLACKFORD v. BUFORD et al. JENNINGS et ux. v. PATRICK ORCHARDS, Inc., et al.**

Circuit Court of Appeals, Fourth Circuit. June 3, 1927.

Nos. 2599–2601.

1. Bankruptcy ⬤�José224—Referee may enter order authorizing trustee to obtain funds for preservation of bankrupt estate (Bankruptcy Act [Comp. St. §§ 9585–9656]).

Though petition by trustee in bankruptcy to obtain funds to protect and preserve bankrupt property should be addressed to judge of court, rather than referee, orders of referee thereon are justified under the Bankruptcy Act (Comp. St. §§ 9585–9656).

2. Bankruptcy ⬤�José272—Trustee must use every reasonable means to avoid deterioration of apple orchards comprising bankrupt estate.

Where bankrupt property consisted of apple orchards, which were of a perishable character, and value thereof likely to diminish, unless trees were sprayed and cultivated, it was duty of trustee to use every reasonable means at hand to avoid deterioration.

3. **Bankruptcy ☞267(1)—Expenses incurred by trustee in preserving perishable property of bankrupt estate held proper charge against purchase price.**

Where bankrupt estate consisted of apple orchards, which were of a perishable character, and likely to deteriorate unless trees were sprayed and cultivated, costs and expenses incurred by trustee in preserving such property between date of bankruptcy and delivery to purchaser constituted proper charge against purchase price received on sale thereof.

4. **Bankruptcy ☞267(2)—Generally expenses of foreclosure and administration are paid out of general estate.**

Generally expenses of foreclosure and administration of bankruptcy are paid out of general estate, rather than out of fund derived from sale of mortgage or lien property.

5. **Bankruptcy ☞267(5)—Foreclosure and administration expenses held chargeable against mortgaged property, where there was no general fund, and expense was for benefit of property.**

Where there was no general fund in bankrupt estate, and expense of foreclosure and administration was incurred wholly for benefit and advantage of mortgaged property, such expenditure was properly chargeable against it, particularly where mortgage or lien creditor voluntarily sought to avail himself of administrative functions of court to realize on his security.

6. **Bankruptcy ☞267(2)—Bankrupt property subject to lien may be charged with expenses of enforcing lien, where creditor avails himself of instrumentalities of bankruptcy court.**

Where lien creditor avails himself of instrumentalities of bankruptcy court in enforcement of his lien, proceeds of property on which lien exists may be charged with expenses necessary in enforcement of lien, as well as in preservation of property.

7. **Appeal and error ☞1008(1)—District Judge's finding will be sustained, unless plainly wrong or without supporting evidence.**

Finding of fact by District Judge, after review of evidence, must be sustained, unless plainly wrong or without supporting evidence.

8. **Estoppel ☞83(3)—Misrepresentations by assignor of vendor's lien notes, inducing mortgage on property, estopped corporate assignee to extent of stock transferred to assignor's family without consideration.**

Misrepresentations by assignor of vendor's lien notes to another, whom he had induced to accept mortgage on same property, that there were no liens against it, *held* to constitute estoppel as against corporation to whom notes were assigned to extent of stock held by members of assignor's family and transferred to them without consideration, since equity in case of fictitious transfer of securities will not permit mere intervention of corporate entity to establish rights which otherwise would be denied.

9. **Estoppel ☞87—That corporate creditor gave up right to collect debt held sufficient to invoke doctrine of estoppel.**

That creditor of corporation gave up right to collect his debt, and accepted second mortgage on some of properties, in reliance on misrepresentations that there were no liens against such property, *held* sufficient to invoke doctrine of estoppel.

10. **Payment ☞39(1)—Allocation of payments made in behalf of consolidated company before bankruptcy by one seeking to float loan held binding.**

Where person seeking in behalf of consolidated company, prior to its bankruptcy, to float loan to pay entire indebtedness, made certain payments to creditors who were pressing and threatening foreclosure, the allocation of such payments as made by creditor was binding on person making such payments.

11. **Bills and notes ☞426—Bonds ☞113—Ordinarily payment by one primarily liable extinguishes obligation on note or bond.**

Ordinarily payment by one primarily liable on note or bond extinguishes obligation thereof, irrespective of intentions to contrary.

12. **Corporations ☞474—Bonds taken up by company and transferred as collateral for note representing loan of money to take up bonds held not paid.**

Where directors of consolidated company, on indorsing note for an amount sufficient to take up certain bonds then due, intended that bonds should not be paid, but that they should be transferred as collateral, and they were transferred for such purpose, in accordance with agreement, and deposited with bank as security for note indorsed, payment of bonds did not result, and obligation thereof was not extinguished, since question of whether there was payment or transfer depends on parties' intention.

Appeals from the District Court of the United States for the Western District of Virginia, at Lynchburg, in Bankruptcy; Henry Clay McDowell, Judge.

In the matter of the bankruptcy of the Patrick Orchards, Inc. From a decree determining priority of claims, the Virginia Securities Corporation, R. C. Blackford, and C. M. Jennings and wife separately appeal; the first and last appeals being opposed by Patrick Orchards, Inc., and others, and the second by W. Erskine Buford, trustee, and others. Affirmed.

No. 2599:

E. J. Harvey, of Danville, Va. (Harris, Harvey & Brown, of Danville, Va., on the brief), for appellant.

W. L. Welborn, of Roanoke, Va. (Welborn & Hobart, of Roanoke, Va., and W. E. Ross, of Bluefield, W. Va., on the brief), for appellees.

No. 2600:

C. F. Cocke, of Roanoke, Va. (Cocke & Hazlegrove, of Roanoke, Va., on the brief), for appellant.

Kennon C. Whittle, of Martinsville, Va. (Whittle & Whittle, of Martinsville, Va., on the brief), for appellees.

No. 2601:

W. E. Ross, of Bluefield, W. Va., and W. L. Welborn, of Roanoke, Va. (Welborn & Hobart, of Roanoke, Va., on the brief), for appellants.

Kennon C. Whittle, of Martinsville, Va. (Whittle & Whittle, of Martinsville, Va., on the brief), for appellees Davis and Buford.

C. F. Cocke, of Roanoke, Va. (Cocke & Hazlegrove, of Roanoke, Va., on the brief), for appellee Blackford.

Before PARKER and NORTHCOTT, Circuit Judges, and GRONER, District Judge.

GRONER, District Judge. These are appeals from a decree of the District Court for the Western District of Virginia in a bankruptcy case, in which the claims of the several parties appealing are wholly unalike. They were, however, heard together on one record, embraced in one decree in the court below, and will be so dealt with in one opinion here. The relevant facts proved in the court below, applicable alike to all appellants are these:

The bankrupt was an orchard company. Its assets consisted of six large orchards, located in Patrick county, Virginia, on which were growing some 81,000 apple trees. Until the latter part of 1923 the six orchards were separately incorporated, although the stock of the six companies was largely owned by Col. Stedman who resided in Patrick county. Some of the orchards were in a state of productivity; some were not. All the companies were in debt, and in need of money for current operating expenses. With a view to relieving this situation Col. Stedman caused a new company to be formed, to which the six properties were conveyed, and which in turn assumed the liabilities of the six companies. Among these liabilities at the time of the formation of the consolidated company was an indebtedness of $110,000 secured by a first deed of trust on four of the orchards. There were vendor's lien notes outstanding on the other two orchards aggregating approximately $13,500 and there was a later deed of trust covering all six orchards, securing appellants Mr. and Mrs. C. M. Jennings the sum of $23,595.53. There were also creditors holding bonds of the consolidated company in a large amount, and general creditors holding claims approximating $15,000. The assets other than the real estate were of small value.

The adjudication was on a voluntary petition on June 17, 1925, and in due time the creditors were convened and a trustee elected. Shortly thereafter appraisers were appointed and filed their report, estimating the value of the real estate at $498,100 and the value of the personal estate at a little less than $4,000, or an aggregate valuation of all of the assets in excess of $500,000. Prompt steps were taken to dispose of the property, and at a meeting of the creditors, held about a month and a half after the bankruptcy, a consent order was entered directing the sale of the properties free of liens. The real estate was offered for sale in separate units on September 17 following, and the aggregate of the several bids was $132,250. Objection was made by some of the unsecured creditors to the confirmation of the sale, but no objection was made by the lien creditors. The referee declined to set aside the sale, but instead confirmed it, and, on petition to the District Court to review his action, that court on December 12 reversed the order confirming the sale and directed that the property should be resold after 60 days' advertisement. By general agreement of the creditors there was some delay in re-advertising, because to have done so at once would have brought the sale in midwinter; but on April 6, 1926, it was again offered for sale and brought in the aggregate $162,275. No objection to this sale was made, and it was confirmed. The purchase price has been paid, and a distribution thereof to the parties entitled thereto has been delayed until the questions involved in this appeal may be finally determined.

These questions may in general terms be stated as follows: First, the right of the trustee to charge against the purchase price of the real estate the costs and expenses of preserving the property between the date of the bankruptcy and delivery to the purchaser, the expenses of sale, and also a part of the costs of administration; second, the validity and priority of the claim of the Virginia Securities Corporation; third, the validity and priority of the claim of R. C. Blackford; and fourth, the validity and priority of the claim of E. J. Davis. These are to be disposed of in the order named.

[1] The property surrendered by the bankrupt to the trustee consisted of over 3,000 acres of land on which were growing 81,000

apple trees, a considerable portion of which, at the time of the trustee's election, viz. July 3, were rich with the promise of harvest. The trustee thought, and so did the creditors (lien and general), that it was the part of wisdom to protect and preserve the trees and their fruit. Obviously this required the expenditure of money, and equally obviously this could only be obtained by borrowing, and while we think that it is better in all such cases that the petition for authority to the trustee thus to obtain the necessary funds for a necessary purpose in the administration of his trust should be addressed to the judge of the court rather than to the referee, and that the judge rather than the referee should pass upon the sufficiency of the need and prescribe the terms of the loan, still there is ample authority in the Bankruptcy Act (Comp. St. §§ 9585–9656), unless some local rule of the court provides otherwise, to justify the entry of such orders by the referee.

[2–5] A painstaking examination of the record fully justifies our conclusion that in each instance in which expense was incurred the reasons for the same were fully set out in the trustee's petition, were properly submitted to and acquiesced in by the creditors, including the lien creditors, were in fact necessary, and in the end doubtless resulted in increasing the price ultimately received at the sale of the property. The property had been appraised at above $500,000. The appraisement was thought to represent something like the fair value of the estate. If this expectation had been realized, the creditors of all classes would have been paid in full, and there would have been a considerable remainder to turn back to the bankrupt corporation. The property was itself of a perishable character. Unless sprayed and cultivated, the trees rapidly deteriorate, and the value of the property greatly diminishes. It was the duty of the trustee under such circumstances to use every reasonable means at hand to avoid this last named result. The lien creditors voluntarily came into the bankruptcy proceedings and asked to have the property sold believing, doubtless, that this would be the most satisfactory as well as the most economical method of administration.

The several steps thereafter taken to this end, as well as the expenditure of money in the upkeep and preservation of the properties pending sale, were matters as to which all had full knowledge, and as to which none protested until the second sale of the prop-

erty, and the allocation of the purchase price to the several liens according to their priorities developed the fact that appellants Mr. and Mrs. Jennings, as holders of the second mortgage note, would receive nothing on account of their debt. We think not only that this protest came too late, but in the circumstances, it is wholly without merit. The general rule with regard to the expenses of foreclosure and administration in bankruptcy is to pay such expenses out of the general estate, if there is one, rather than out of the fund derived from the sale of mortgage or lien property; but where there is no general fund, as was the case here, or where the expense has been incurred wholly for the benefit and the advantage of the mortgaged property, as also is the case here, such expenditure is properly chargeable against it, and particularly is this true where the mortgage or lien creditor voluntarily chooses to avail himself of the administrative functions of the court in bankruptcy to realize on his security. This question has been so fully covered by previous decisions of this and other courts that we deem it unnecessary to do more than refer to some of the cases. See In re Barber (D. C.) 97 F. 547; In re Torchia (D. C.) 185 F. 576; Id. (C. C. A.) 188 F. 207; In re Chambersburg (D. C.) 190 F. 411; In re West (D. C.) 232 F. 903; In re Rauch (D. C.) 226 F. 982; The Bethulia (D. C.) 200 F. 879; Gugel v. Bank (C. C. A.) 239 F. 676.

[6] Here, as has already been said, practically the whole estate in process of administration was real estate, on all of which there were different classes of liens, but as to which there was a reasonable expectation that the proceeds of sale would pay the same in full and leave a substantial equity. To determine this question it was necessary that the property should be sold and pending its sale that it should be preserved. To accomplish this the lienholders had the benefit of the services of the trustee and of his counsel. Proper orders looking to the sale of the property had to be drawn and presented, and the property in the meantime had to be maintained in a high state of cultivation, in order to preserve it from serious deterioration and loss. All of these things were for the benefit primarily of the lienholders, who had sought and invoked the aid of the court in the collection of their debts. By coming into bankruptcy, they lost none of their rights; but when a lien creditor avails himself of the instrumentalities of the court in the enforcement of the lien, then the proceeds of

the property upon which the lien exists may be charged with the expenses necessary in the enforcement of the lien as well as in the preservation of the property. There is no allowance in the decree of the court below to the trustee, referee, or counsel for services in the general administration of the estate. The allowance to counsel and the statutory fees are made on the basis of services rendered in the administration of the lien property which as it turned out unexpectedly brought less than the total lien debts. It therefore follows that the decision of the lower court as to this phase of the matter was clearly right.

[7-9] 2. The claim of the Virginia Securities Corporation grows out of these facts: Several years prior to the formation of the consolidated company (bankrupt) one of the orchards, which was at the time of the consolidation or merger conveyed to the last named company, belonged to M. V. Stedman who sold it to the Rich Creek Orchard Company. A part of the purchase price was paid in cash. The residue was represented by three vendor's lien notes of $2,573.41 each. One of these notes was paid, and the two remaining notes were assigned by Stedman to the Virginia Securities Corporation, the appellant, and were held by it when the bankruptcy occurred. The referee allowed the claim as entitled to priority. The District Court on review reversed this holding of the referee, and disallowed appellant's claim as a preferred claim in its own right, but permitted appellant to claim as trustee for certain of its stockholders the same ratio of the proceeds which the number of shares owned by said stockholders bears to the total number of shares of stock of appellant. The ground upon which the court based its action was that as to all of the remaining shares of stock in appellant company the same were issued without consideration, and the holders thereof were charged with notice of all the equities existing against Stedman, and that Stedman was estopped from asserting priority of lien on account of the lien notes because of his representations to Capt. and Mrs. Jennings, whom he had induced to accept a mortgage on the same property that there were no liens against the same. The only questions for determination in this connection are: Did Stedman make the alleged representations; and, if so, do they constitute an estoppel against appellant, Stedman's assignee?

The first question, after a careful review of the evidence, was answered by the District Judge in the affirmative, and this finding must be sustained, unless it is plainly wrong or without supporting evidence, and this we think is not the case. The evidence as to estoppel shows that the Securities Corporation was a paper corporation, or, as characterized by the District Court, "a mere name for Col. Stedman and his immediate family," and was doubtless formed by Col. Stedman for the purpose of holding in a corporate capacity certain private interests of his own; the stockholders were all members of his family, and, with the exception of 25 shares, the same were conveyed to members of his family without consideration. In such circumstances a court of equity will look at the substance rather than the shadow, and if, as was found by the court below, the transfer of securities to that corporation by M. V. Stedman was merely a fictitious transfer to himself and to his family, the mere fact of the intervention of the corporate entity will not be permitted to establish rights which otherwise would be denied, nor prevent the real nature of the transaction from being examined.

We agree with the District Judge that such facts put on those of the stockholders who are such by transfer from Col. Stedman a burden of proof they have failed to carry. And we also agree that the statement by Col. Stedman to Capt. Jennings was material, and was the real inducing cause to the latter to postpone the attempt to collect his debt not only for the agreed period of 90 days, but probably also to the later period of nearly a year and a half, during which time he remained ignorant of the fact that his security was impaired. At the time of the postponement of the debt, at the request of Col. Stedman, and the acceptance of the second mortgage upon some of the properties and what he believed to be a first mortgage on the others, Capt. Jennings was in a position to push his claim and to insist on immediate payment. What would have been the result of this action, as suggested by the District Court, is now pure speculation, but that he gave up a valuable right which no one can now say might not have then been of some value is in our opinion sufficient to invoke the doctrine of estoppel. See Leather Manufacturers' Bank v. Morgan et al., 117 U. S. 96–115, 6 S. Ct. 657, 29 L. Ed. 811; Bigelow on Estoppel (6th Ed.) p. 696, and cases there cited.

[10] 3. The claim of R. C. Blackford arises out of the following facts: Prior to the bankruptcy he had been interested, in behalf

of the consolidated company (the bankrupt), in an effort to float a loan of $250,000 out of which if successful the entire indebtedness of the company would have been paid and presumably enough would have been left to furnish working capital to continue its operations. Nolting & Co., the holders of the $110,000 first mortgage bonds on four of the orchards, were pressing for payment and threatening foreclosure. In order to gain time, Blackford paid them $2,500 and agreed to pay them $300 every ten days thereafter. This he did to the extent of total payments of $4,000. The effort to float the new bond issue was not successful and the company went into bankruptcy. Nolting & Co. credited Blackford's payments to the past-due mortgage indebtedness of one of the orchards which as it turned out at the sale did not sell for enough to pay the first mortgage bonds.

Blackford insists that his payments to Nolting should have been credited to the indebtedness of another of the orchards, which did, and that he should be subrogated to the rights of the holders of the bonds paid from his money to the extent of his advances. The referee was of opinion, and in this respect was sustained by the District Court, that the allocation of Blackford's payments as made by Nolting was binding upon Blackford, and that, since this fund was only sufficient to pay the proportionate part of the costs and the bonds remaining in Nolting's hands, nothing remained to pay off the bonds "subordinated" and allocated by Nolting to Blackford. In this we concur. Indeed, we think it doubtful whether under the circumstances Blackford was entitled to be subrogated to the rights of the holders of the bonds under either mortgage, or that the advances by him were entitled to any other or greater dignity than that of a loan to the corporation whose existence he was endeavoring to preserve, but as it is not necessary to decide this question, we content ourselves with affirming the decree as respects this claim.

4. The facts necessary to an understanding of the claim of E. J. Davis are these: Patrick Orchards, one of the units in the consolidated company (bankrupt), prior to the consolidation, executed its negotiable bonds aggregating $50,000 which it secured by deed of trust and which as to $46,000 thereof it sold to Frederick E. Nolting & Co., bond brokers of Richmond. The remaining $4,000 of bonds were issued, but stamped on the face thereof subordinate to the $46,000 sold to Nolting. Whether these bonds were afterwards sold to Nolting, or whether they were held in the treasury of the company, is a matter which the evidence leaves in doubt; but in April, 1923, $2,500 of the $46,000 of bonds had become due, and it was necessary that the company should obtain funds to pay the same, together with the interest on the entire issue, as well as a number of other pressing obligations.

A meeting of the directors of the company was held for the purpose of discussing ways and means of accomplishing this result, and it was then agreed that the company would execute its promissory notes for $12,000, that the directors, except Capt. Jennings, should indorse them, and that they should be negotiated at two local banks and the proceeds used in the payment of the company's indebtedness. There is a conflict in the evidence as to whether it was then agreed that the $2,500 of accruing bonds and the $4,000 of subordinated bonds should be acquired from Nolting and transferred to the Bank of Stuart as collateral security, or whether the payment to Nolting was an extinguishment of the bonds. The referee who heard the witnesses testify found that there was an agreement to keep the bonds alive by transfer to the Bank of Stuart as collateral security and that the indorsers of the notes became such on the distinct understanding that this would be done.

A careful review of the evidence satisfies us that the referee and the District Court were correct in so finding. It is true the witnesses who were heard testified entirely from memory, but all of them except Jennings recalled that the facts were substantially as claimed; that is to say, that it was understood that the bonds were to be transferred from one holder to the other. It is true Capt. Jennings, who opposed the allowance of the Davis claim, testified that he had no recollection of anything being considered at the meeting with relation to the future status of the bonds; but his testimony is negative in character, is opposed to the greater weight of the evidence, and is wholly contrary to the events immediately succeeding, for the evidence conclusively shows that the bonds were delivered by Nolting to Stedman, not marked "Paid," as would ordinarily have been the case, but were stamped with an indorsement subordinating them in priority to the remaining bonds held by that firm, and with the understanding that they should be kept alive. They were placed with the Bank

of Stuart as security for the notes on which the money had been raised to acquire them, and when Davis, as the only remaining solvent indorser of these notes, was subsequently required to pay them, the bank delivered the bonds to him.

[11, 12] Ordinarily the rule is that payment by one primarily liable on a note or bond extinguishes the obligation thereof, irrespective of his intention to the contrary; but in this case whether there was a payment or merely a transfer of the bonds is the exact question in issue. This, we think, depends upon the intention of the parties. Hall Building Corporation v. Edwards, 142 Va. 209, 128 S. E. 521; Ketchum v. Duncan, 96 U. S. 59, 24 L. Ed. 868. As it clearly was not their intention that the bonds should be paid, but that they should be transferred in such manner as to carry out the agreement with the indorsing directors, and as they were transferred for that purpose, and, in accordance with the agreement, were deposited with the bank as security for the note which the directors indorsed, we think that payment did not result, and that the obligation of the bonds was not extinguished by what was done. See Howe v. Lewis, 14 Pick. (Mass.) 331; Johnson v. Valido Marble Co., 64 Vt. 337, 25 A. 441; 19 R. C. L. title "Mortgages," § 222, and cases there cited.

It should be noted that the case here presented is not that which arises where the maker of a note attempts to purchase it and keep it alive, or, having made payment, attempts to revive or transfer it. Here the transfer was made for the benefit of indorsers whose indorsement secured the funds which in turn secured the transfer, and who gave the indorsement upon the express condition that the bonds were to be kept alive and transferred for their security. It would be most inequitable to deprive them of this security, especially in view of the fact that, but for the agreement under which the transfer was made, and without which it would not have been made, they would have had the security of the mortgage to protect their indorsement of the bonds.

At the time of this transaction Capt. Jennings' mortgage was not in existence. It was not until some time later that any rights of his accrued. No other rights had therefore intervened, which could be prejudiced by the action taken. Since, therefore, we find ourselves in accord with the District Court in all respects, the decree of that court should be and is in all respects affirmed.

Affirmed.