SAMUEL B. BIRD,

Defendant Below, Appellant,

*vs.*

THE WILMINGTON SOCIETY OF THE FINE ARTS, a corporation of the State of Delaware,

Defendant Below, Appellee,

and

WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, Trustee under the will of Joseph Bancroft, Deceased,

Complainant Below, Appellee.

*Supreme Court, On Appeal, May 28, 1945.*

LAYTON, C. J., and RICHARDS, RODNEY, SPEAKMAN, and TERRY, JJ., sitting.

*Robert H. Richards* and *Aaron Finger,* for appellant.

*Hugh M. Morris, Alexander L. Nichols,* and *S. Samuel Arsht,* for appellees.

454

456

RODNEY, Judge, delivering the opinion of the majority of the court:

Before entering upon a consideration or construction of the words of this particular will it would seem not inappropriate to recast some general principles applicable to that construction.

It is a familiar expression that all rules of construction of wills have for their object the ascertainment of the intent of the testator. This object is basic and fundamental, for it is only to ascertain the intent of the testator that rules

of construction can or should have existence, and no rule could be well founded which has another primary object.

Now what intent of the testator is sought to be ascertained? A court can never commence its study of a will by utilizing its knowledge of the surroundings and circumstances of a testator, and from these infer an intent which in its opinion should or probably did exist, and then construe the will to give effect to that intent. The intent of a testator in a testamentary instrument which is sought to be ascertained is not that a general intent sought to be ascribed to him by reason of his circumstances and what would seem the natural or proper intent to the construing authority. The intent of the testator which is sought to be ascertained is that intent which such testator has attempted to express in the language used by him in the will.

It is not the function of the court to make a will for the testator or to improve on the will as found. It is not the function of the court to give to the language of the testator an intent not discernible from the will itself or from the surrounding circumstances. Upon the contrary, it is clearly the function and duty of the court to take the entire will of the testator in the language there used, and attempt to find the true meaning and intent of the testator. The language used in the testamentary instrument is either the language of the testator himself, or of some counsel or assisting agent whose language is adopted by the testator in the will. Because language of a will is but the vehicle of the thought or the intention of the testator, so the courts have felt free to give expression to the true intent when it can be ascertained, even though the so doing may depart from the strict wording of the will. The language of a will, be it the original language of the testator or the language of another and adopted by him, was the language used by the testator in the light of surroundings and circumstances known to him. To take such language then, of and by itself and devoid of the surrounding circumstances, may

be the means of giving but an imperfect picture of the thought or intent of the testator. It is this view, then, that impels courts to metaphorically place themselves at the desk with the testator as at the time of execution of the will, and see with his eyes and to ascertain with his knowledge the meaning of the language used.

As one writer has pointed out, there are two extremes of construction to be avoided. One is the bare meaning of the words in the abstract, and the other is the supposed intent of the testator, independent of or not necessarily dependent upon the words of the will. The true rule lies between the two, and seeks the intention of the writer, but must find it in the words: it seeks the meaning of the words, but such meaning must be in the sense and manner intended to be used by the testator.

These thoughts have no novelty in themselves, and are but the epitome of countless cases found in every jurisdiction. Every case cited by the appellant or appellee on the subject of general construction would seem consistent with these principles.

Before adverting to the particular language of the instant will it would seem proper to dispose of certain preliminary questions. Two of these questions may be:

(a) When does the will speak or as of what date are the crucial words to be construed?

(b) Are the crucial words of the will to be construed in the light of circumstances known to the testator, or in the light of the dissolution of the Estate Corporation brought about by the trustees after the death of the testator?

(a) As a will takes effect at the death of a testator, so it is the general rule that a will speaks as of that time, unless there is something in the will to indicate a different time. The three periods usually involved in determining the time that a will speaks are the date of the will, the death

of the testator, or such other time which may be indicated by the testator. No contention is here made that the present will speaks as of its date, so that question will not be further pursued, although many cases, insofar as intent is concerned and as distinguished from effectiveness of the will, construe such intent as of the date of the will. Both appellant and appellee concede the correctness of the rule as expressed in *Harris v. Harris*, 97 *N. J. Eq.* 190, 127 *A.* 108, 109, where it is said:

"A will ordinarily speaks from the time of the death of the testator. Where a contrary intention is manifest on the face of the will, the will will be read as of the time the testator intended it should speak."

Let us then examine whether there be a contrary intention manifest on the face of the will. The appellant contends that because of the trust involved and the interposition of a life estate in the income of such trust fund the will speaks as of the death of the life tenant, and not the death of the testator. To sustain this contention there is cited *Hawke v. Lodge*, 9 *Del. Ch.* 146, 77 *A.* 1090, 1091, and similar cases. In the *Hawke* case it is said:

"that where there is a gift of personal property * * * preceded by a life estate, the survivorship relates to the death of the life tenant and not to the testate."

The *Hawke* case is in accord with the English and prevailing American rule, as shown in the comprehensive annotations in 114 *A.L.R.* 4 @ 54. The principle relied upon can, however, have no application to the present case. Here there is no question of survivorship involved, and the quoted principle has no application to the character or quantum of the gift.

The testator created a trust to last during the life of the testator's wife. Upon the death of the wife the trustee is directed to transfer to the appellant "all the stock I may own in the Joseph Bancroft Company." The testator knew, of course, that the death of the wife might happen soon after his own, whereby the trust would be then termi-

nated and the trust estate immediately distributed, and that this trust estate would consist solely of the assets held by the testator. The trust, on the other hand, conceivably could have lasted many years, and the widow did survive the testator for five years. Clearly, the language of the will would not have authorized the trustee, during the continuance of the trust, to invest the trust funds in stock of the Joseph Bancroft Company, so as to have become transmissible under the will to the appellant, to the detriment of other beneficiaries of the trust fund. Clearly the language of the will does not purport to deal with any stock not owned in any manner by the testator in his lifetime, but acquired by the trustee after the death of the testator, and held in the trust estate at the death of the widow. "Stock that I may own" indicates stock with which the testator had some personal connection, and would seem to be referable to the last point of time to which the personal connection could be applicable or the last point of time when the testator could possibly own stock, viz., the death of the testator.

The foregoing construction is made more certain by a consideration of Item 12. In Item 12 the trustee was authorized to sell and dispose of trust property, provided that no sale should be made of "my stock" in the Bancroft Company without the consent of the appellant, and in any event the Item secured the proceeds of such sale to the appellant. Here again is specific reference to the stock owned by the testator at the time of his death. All of the Bancroft stock owned by the testator at the time of his death became vested in the trustee, and this is the stock the sale of which was limited. It had reference to stock with which the testator had a personal connection, and, as to such stock, spoke as of the death of the testator. The fact of the interposition of the life estate in the income merely postponed the enjoyment of the bequest theretofore established. We find no contrary intent as to the time the will should speak "manifest upon the face of the will," and

think the will should speak as of the death of the testator.

(b)   Are the crucial words of the will to be construed in the light of circumstances known to the testator, or in the light of the dissolution of the Estate Corporation brought about by the trustees after the death of the testator?

As we have hereinbefore indicated, it is the plain duty of the court to ascertain the intent of the testator not alone from the bare words of a will, found in the instrument itself, but from the circumstances which then surrounded the testator, and which clearly entered into his thoughts and created his intent. *Maloney v. Johnson*, 24 *Del. Ch.* 77, 5 *A.* 2d 660. The corollary of this rule, however, is equally clear, and the consideration by a court of the surrounding circumstances entering into the construction of the words of a will is confined to those circumstances existing at the time the will was executed. Subsequent events or circumstances not clearly shown to have been definitely anticipated by the testator, and happening after the execution of a will, can form no part in the intent of that will, or enter into the construction of its terms. 2 *Page on Wills,* (3d Ed.) *Sec.* 920; *New Britain Trust Co. v. Stoddard,* 120 *Conn.* 123, 179 *A.* 642; *Morris v. Sickly,* 133 *N.Y.* 456, 31 *N.E.* 332; *Lydick v. Tate,* 380 *Ill.* 616, 44 *N.E.* 2d 583, 145 *A. L. R.* 1216.

The will of Joseph Bancroft was executed in 1931. At that time his mother and sister each held a one-third stock interest in the Estate Corporation, and Joseph Bancroft held the remaining one-third of the stock. The corporation had been in existence since 1916. During the intervening fifteen years between the creation of the corporation and the making of the will, Joseph Bancroft, his mother and his sister each held an equal one-third interest in the corporation, and no one of these could have brought about its dissolution without the concurrence of one or more of the other stockholders. Two years after the execution of the will by Joseph Bancroft, and in 1933, his mother died, and her

stock holding in the Estate Corporation became divisible in equal shares between the said Joseph Bancroft and the trustees under her will. Three more years elapsed until the death of Joseph Bancroft in 1936, and the Estate Corporation continued to function as previously, with Joseph Bancroft holding (or entitled to) a one-half interest in its stock, his sister holding a one-third interest in the stock, and the remaining one-sixth interest being in the trustees under the mother's will. Four years after the death of Joseph Bancroft (July 1, 1940) the Estate Corporation was dissolved, and one of the assigned reasons for the dissolution was the diverse holding of the interests, and the disinclination by the trustees under the will of Joseph Bancroft to continue responsibility for actions affecting the personal and outright holding of one of the individual stockholders.

The dissolution of the corporation in 1940, some nine years after the execution of the will by Joseph Bancroft, and some five years after his death, was not such a surrounding circumstance as to entitle it to consideration in arriving at the intent of Joseph Bancroft when he executed the will in 1931. This is so, notwithstanding the fact that some few years before the making of the will Joseph Bancroft had personally considered such dissolution, but there is no evidence of any corporate action, or any suggestion made by him to the other stockholders, and Joseph Bancroft could not, alone, have dissolved it.

Upon the death of Mary R. Bancroft (mother of the testator) in 1933, the trustees under her will, Wilmington Trust Company and Daniel M. Bates, became interested in the Estate Corporation as the holder of one-sixth of the stock of said corporation, and a representative of the Trust Company thereafter served upon the board of directors. It is affirmatively in evidence that after 1933, and until his death in 1936, Joseph Bancroft, so far as known, made no suggestion to any officer of the Trust Company concerning the dissolution of the Estate Corporation, nor had he any

reason to anticipate that action would be taken by the Trust Company after his death, leading to such dissolution.

We now come to what may be termed the crucial terms of the will and the manner of their construction.

By Item 10 the testator placed all the rest and residue of his estate in trust, and provided that the income from the trust estate should be paid to his wife for life. He then provided:

> "Upon the death of my wife, in further trust, to transfer [and] convey unto my nephew Samuel B. Bird, if he is then living, all the stock which I may own in Joseph Bancroft and Sons Company a corporation existing under the laws of the State of Delaware."

We shall not pause to consider the words "if he is then living," as applied to the nephew, and the effect of those words on the intent of the testator. Conceivably those words might have a bearing upon the intent of the testator to benefit the nephew personally if he survived the widow, but not otherwise to benefit his estate, or those claiming under him. The nephew did survive the widow, and we prefer to attempt to ascertain the intent of the testator as to that state of facts that did eventuate. There are three words in the item to receive specific attention. These are "all", "may" and "own." The word "all" may be quickly dismissed, for it clearly defines the totality of the gift, and is intended to exclude the application of a part only. The word "may" likewise will receive scant attention. If we are correct in assuming that the will spoke as of the death of the testator, then the word "may" could well indicate the stock that the testator "may" (or could) own at the time of his death, and was used in contra distinction to "now", or any similar word or words which might be thought to confine the meaning as of the date of the will. It is in evidence that between 1926 and the death of the testator in 1936 the testator bought 1700 shares of the common stock of Joseph Bancroft Company and sold none. The most critical word in the Item is the word "own," and around it cluster the diffi-

culties. The words "all" and "may" relate to and are subservient to the word "own."

The word "own" is a generic term embracing within itself several gradations of title dependent upon the circumstances. Its common meaning, as defined by Webster's New International Dictionary (2d Ed.) is "to possess: to have or hold as property * * *." In *Aldridge v. Franco Wyoming Oil Co.*, 24 *Del.Ch.* 126, 7 *A.2d* 753, 765, the words "owner" and "hold" were said to be words of similar import.

In the present case it is contended that the words of the will "all the stock that I may own in Joseph Bancroft Company," embrace and include not only the stock in such company individually owned by the testator, but also the stock of such company owned by another corporation (the Estate Corporation), in which latter corporation the testator, in turn, owned stock. Few principles of corporation law are clearer than that, as a general rule, a corporation is an entity distinct from its stockholders. 1 *Fletcher on Corp.*, (*Perm.Ed.*) *Sec.* 25 *et seq.*

It is apparent that we are not considering the case of a corporate structure all the shares of which are united in one person. As to such corporations some cases hold that, at times, other and distinct principles may apply. Even as to such corporations, in the absence of other circumstances it is usually held that the fact that one person owns all of the stock of a corporation does not make him and the corporation one and the same person. *Martin v. D. B. Martin Co.*, 10 *Del. Ch.* 211, 88 *A.* 612, 102 *A.* 373. We are similarly not considering a case where, as in *United States v. Milwaukee Refrigerator Transit Co.*, (7 *Cir.*) 142 *F.* 247, 255, the court stated the general rule, but stated:

"* * * when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons * * *."

The Estate Corporation was formed in 1916, and im-

mediately after its incorporation had assets aggregating $2,000,000.00, including some shares of Joseph Bancroft Company, both preferred and common. The uniform rule is that those shares were owned by the "Estate Corporation," and that the owners of the stock of the "Estate Corporation" were not the owners of the stock of other corporations held by such "Estate Corporation." As stated by *Rhode Island Hospital Trust Co. v. Doughton*, 270 *U.S.* 69, 46 *S. Ct.* 256, 258, 70 *L. Ed.* 475, 43 *A. L. R.* 1374:

> "The owner of the shares of stock in a company is not the owner of the corporation's property. He has a right to his share in the earnings of the corporation, as they may be declared in dividends, arising from the use of all its property. In the dissolution of the corporation he may take his proportionate share in what is left, after the debts of the corporation have been paid and the assets are divided in occordance with the law of its creation. But he does not own the corporate property."

See also cases collected in 1 *Fletcher Corp., (Perm. Ed.)* Sec. 31.

As expressed in 5 *Thompson on Corporations, (3d Ed.) Sec. 3462,*

> "The shareholders of a corporation are not tenants in common, or in any other sense joint owners of the corporate property, either before or after its dissolution. Before the dissolution the whole title to the property is in the corporation itself as legal owner. * * *"

Such has been the construction of the Delaware law. *Coudon v. Tait, (D.C.)* 56 *F.* 2d 208; *Martin v. D. B. Martin Co.,* 10 *Del. Ch.* 211, 88 *A.* 612; *Tilden v. E. A. Stevenson Co.,* 3 W. W. Harr. (33 *Del.*) 47, 130 *A.* 236.

As Justice Holmes tersely said in *Klein v. Board of Tax Supervisors*, 282 *U.S.* 19, 51 *S. Ct.* 15, 16, 75 *L. Ed.* 140, 73 *A.L.R.* 679:

> "The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members."

Some consideration must now be given to the question

of the extrinsic evidence tentatively admitted by the Chancellor in his consideration of the case in the court below. This extrinsic evidence the Chancellor summarized as touching the following matters:

(1) That the will was drafted by the testator himself, who was not a lawyer.

(2) Facts concerning the creation, development, purpose and management of the Estate Corporation, including the interest of the testator therein, and that the corporation had purchased Joseph Bancroft Company stock and sold none.

(3) That testator individually had purchased Joseph Bancroft Company stock at various times after 1926 and sold none.

(4) Pride and interest of testator in Joseph Bancroft Company and his interest in the connection of the appellant, his nephew, with the company.

(5) Statement of testator that appellant should have "all the interest of my father's side of family" in Joseph Bancroft Company.

(6) Statements of testator as to his acquiring and holding stock in the Joseph Bancroft Company in order to obtain a controlling interest therein.

It is not entirely clear what consideration was given to the extrinsic evidence admitted. Such evidence was stated to have been "tentatively" admitted, and some of the testimony was utilized by the court in its opinion, but therein it is also said "substantially all of the evidence, tentatively admitted at the hearing, must, therefore, be disregarded and stricken out."

The appellant, of course, expressly contends that the extrinsic evidence should neither be stricken out nor disregarded.

Extrinsic evidence admitted, at times, as an aid to the construction of a will, may generally be divided into two classes, both of which must be considered because both are involved in this case, and the rules governing the two classes may not be entirely the same. The two classes are:

(a) Those facts and circumstances concerning the testator, the recipient of his bounty, the character and extent of his property, and any other facts which were known to the testator and entered into his intent in using the words he used in the will, and which should be equally in the knowledge of the court in ascertaining that intent.

(b) The declarations of the testator himself with reference to the language of the will, or bearing upon its meaning.

It is a general rule that a presumption exists that a testator uses ordinary words in their ordinary meaning, and that except as rebutted or affected by the context, these words are so construed. From these rules flow the thought that "it is not permitted to interpret that which has no need of interpretation."

Notwithstanding these general rules, courts still have the duty of attempting to place themselves in the position of the testator, and to ascertain his intent in using the words he did use. For this purpose courts may, and usually do, admit certain extrinsic testimony to ascertain if any ambiguity exists in the language of the will, and to determine that ambiguity. This testimony is often essential to definitely determine the identity of the beneficiary, or the character and extent of the property disposed of.

It would seem unnecessary to enter upon a detailed citation of the great number of cases dealing with the admission of extrinsic evidence as an aid in the construction of wills. Most of the American cases are listed in 4 *Page on Wills, (Permanent Edition), Secs.* 1317-1350, and in the exhaustive note in 94 *A.L.R.* 26-293. The English cases

are generally collected in 34 *Halsbury's Laws of England,* (2d Ed.), 158 *et seq.*

We shall now briefly consider the extrinsic evidence admitted by the Chancellor in the order as summarized by him.

1. Evidence was admitted tending to show that the testator drew his own will and was not a lawyer by training or profession.

Evidence that a will was drawn either by a trained lawyer or by a layman is often admitted, but this is for the purpose of ascertaining the intent of the testator, and is usually to show either the understanding of the problems involved, or the lack of comprehension of them, with especial reference to the use of technical legal terms. In the present will, insofar as here material, there were no technical legal terms employed, and the language of the will could have been employed by a layman as well as by a lawyer. The testator is shown to be a man of large estate and the president of a company of considerable size. That he was a man of education may be gathered from Item 8 of the will, where he devotes especial attention to the disposition of his library.

Items (2), (3) and (4) of the summarization of extrinsic testimony relate to the testimony concerning the creation, management and purpose of the Estate Corporation, and its ownership and retention of shares of the Joseph Bancroft Company, and similar actions by the testator: with the pride and interest of the testator in the Joseph Bancroft Company, and his desire to have his nephew connected therewith, and his interest in the nephew, the appellant.

The language of the testator "all the stock I may own in the Joseph Bancroft Company" may seem clear and explicit, but in determing the extent of the stock held by the testator extrinsic evidence was admissible to show stock in such company in which the testator was in some way in-

terested, and to determine the meaning of the word "own" in connection with such stock.

As we have stated, it is not entirely clear as to the final disposition of this evidence in view of the language of the Chancellor—"substantially all of the evidence, tentatively admitted at the hearing must, therefore, be disregarded and stricken out." We think it somewhat more accurate to say that upon full hearing and consideration the extrinsic evidence offered does not modify or change the intrinsic evidence of the intent of the testator, as expressed in his will. The true principle is that construction must arise from the will, and not that a will can be recreated by construction. Upon full consideration of the extrinsic testimony we are remanded to the will and the subsequent proceedings, and find that all of the stock of Joseph Bancroft Company owned by the testator has been assigned to the legatee, the appellant, and the provisions of the will have been fully met. Extrinsic evidence can do no more than explain language and show intent, but cannot furnish an intent itself which the language does not do.

Items (5) and (6) of the summarization of extrinsic evidence may be treated together. They seem to differ from the other matters which, as we have seen, concerned the facts and circumstances presumably known to the testator. Items (5) and (6) concern statements of the testator himself, from which statements the intent is sought to be gathered. In many jurisdictions different rules govern the admission or consideration of these two classifications. Sir James Wigram first brought some order into the use of extrinsic evidence by the formulation of seven propositions. These are conveniently found in 94 *A.L.R.* 30. The seventh proposition has been followed in many jurisdictions, and in general terms provides that while material surrounding facts and circumstances are admissible as extrinsic evidence of intent, yet the statements of the testator himself can only be invoked when the words of the will describe well,

or equally well, two or more persons or two or more things, and the declarations are offered to show which, as used in the will, was intended. In *Grave's "Extrinsic Evidence,"* 14 *Va. Law Reg.* 914, 934, it is contended that the statements of the testator are not admissible to explain the meaning of an ambiguous expression, or to explain generic terms or the extent of their meaning, as employed by the testator. Such matters may be solved by construction aided by the surrounding circumstances, but not by the statements of the testator.

*Hawkins on Wills,* (2d Ed.) 16, adopts the language of Lord Abinger in *Doe v. Hiscocks,* 5 M. & W. 363, 151 Eng. Reprint 154, to the same effect.

In *Darden v. Bright,* 173 Md. 563, 198 A. 431, at page 437, the court held that declaration of intentions by the testator are not admissible to effect an interpretation, saying:

"Such declarations are only receivable to assist in interpreting an equivocation which results from the use of a term in the will which, upon application to external objects or subjects, is found to describe two or more external objects or subjects equally."

A number of jurisdictions have somewhat relaxed the rule and receive evidence of the declarations of a testator where such declarations relate merely to the surrounding circumstances known to the testator, or his relations to a beneficiary. Few, if any, cases allow such testimony in connection with the interpretation of the words of the will, or of his intention respecting the disposition of his property. *Calder v. Bryant,* 282 Mass. 231, 184 N.E. 440, 443, 94 A.L.R. 18.

Where the rule is not relaxed, or relaxed to a slight extent, the exclusion of the declarations of a testator is based upon grounds of public policy, and that the rule of law requiring wills ordinarily to be in writing presents too formidable a barrier to allow evidence of direct state-

ments of a testator as to what he meant by the use of certain words.

In Delaware the statements of the testator have generally been excluded.

In *Walter's Lessee v. Miller,* 5 *Har.* 151, evidence of declarations of the testator was ruled out.

In *Carson v. Doe ex dem. Hickman,* 4 *Houst.* 328, the Court of Errors and Appeals held that parol evidence of the declarations of the testator made after the will was executed, could not be received to explain which of two trusts mentioned in the will was to go to each of the two devisees named.

In *Sussex Trust Co. v. Polite,* 12 *Del. Ch.* 64, 106 *A.* 54, 55, the court said that "declarations whenever made by a testator as to his intentions in using certain words in the will, or as to a proper construction of them, are inadmissible in evidence."

In *Winkler v. Woodruff,* 21 *Del. Ch.* 147, 150, 182 *A.* 409, 410, the late Chancellor Wolcott said:

"Evidence which was tendered to show by the testator's statements what he intended by the language of the will was rejected."

These principles were tacitly admitted by counsel for the appellant, at least to the extent that the declarations could not be used for the purpose of construing the will. At the time of the offer of testimony it was expressly disclaimed that the declaration was "about his will or what was meant by what was in the will." At least two witnesses testified as to the declarations of the testator with respect to the interest of the testator in his nephew, the appellant, and in his plans or aspirations as to the Joseph Bancroft Company. One witness testified that the testator in 1934 stated "Some day Sam [the appellant] will have all the interests of my father's side of the family." Since the testator had bequeathed stock in the company to the ap-

pellant in his will executed in 1931, and the present controversy concerns the extent of that bequest, the suggested declaration might have a bearing upon the intent of the testator as to the meaning of the language of the will and the comprehensiveness of the legacy. For these purposes the declarations could not be considered.

For the appellant it is argued that the words of the will "all the stock that I may own in the Joseph Bancroft Company" included not only the stock which was registered in the name of the testator himself, but that it covered also stock to which the testator became entitled in his lifetime and upon settlement of the estate of his mother, Mary R. Bancroft, but which stock had not been actually transferred to the name of Joseph Bancroft in his lifetime. From this it is plausibly contended that since the words of the will operated not only on the stock to which the testator had a legal title, being registered in his name, but also on the stock formerly of his mother, as to which the testator held an equitable title, that the words of the will should equally apply to the stock of Joseph Bancroft Company owned by the Estate Corporation, in which the testator had, as contended, an equitable interest as a stockholder of the Estate Corporation. While the present case does not concern or involve any stock of the testator derived from the estate of his mother, Mary R. Bancroft, and no such question is here presented, yet the suggested analogy may be briefly investigated.

The difference between the two situations is rather marked, and may be important. The distinction is in title, and the difference exists between a clear equitable title on the one hand and a mere beneficial interest on the other. In the first case the testator was, upon settlement of his mother's estate, the equitable owner of the interest acquired by him from her, and could at all times have compelled the merging of the equitable title with the legal title. In the second case, the testator owned stock in the Estate

Corporation, which in turn owned certain Bancroft stock. The testator did not own or have any title, as such, to the assets of the corporation of which he was a stockholder. All of the cases so hold. As a stockholder of the Estate Corporation, the testator had, in common with other stockholders, and subject to the liabilities of the corporation, all the beneficial right which might grow out of the assets of the corporation, but he had no such title as would enable him to compel the transfer of any of these assets to himself, or to deal with or dispose of such assets. As between the corporation and the stockholder, the stockholder is sometimes spoken of as the beneficial or equitable owner.

The appellant by an elaborate argument contends that the "Estate Corporation" was a mere agency for the stockholders, and that the corporation, as such, was not the owner of the shares of Joseph Bancroft Company held by it. He contends that even the original stock subscription of $1200.00 was not in fact paid in cash, and relies upon the equitable principle that when property is conveyed to a grantee under circumstances that do not constitute a gift, that a resulting trust arises, and the grantee will be construed to hold the property for the grantors. To sustain this view, the appellant cites *Hamilton v. First Nat. Bank,* (*Tex. Civ. App.*) 155 *S.W.* 2d, 626, 630; *Freeman v. Tatham,* 5 *Hare* 329, 67 *Eng. Reprint* 939; *United States v. Brager Building & Land Corporation,* (4 *Cir.*) 124 *F.* 2d 349.

These cases may have correctly determined the factual situations there involved, but they cannot control the present matter. No case has been drawn to our attention holding that a valid corporate entity was not created under the facts here present. Three persons jointly and equally entitled to real and personal property conveyed and transferred the property to a corporation formed by them. They each received stock of the corporation in the exact proportion to their interest in the real and personal property conveyed or transferred to the corporation. It is objected that this

stock was not issued in consideration of the property, but was stock subscribed for by the parties, but not paid for by them in cash. The distinction would seem to be without substance. No rights of creditors were ever involved, and no proceedings taken by the State. The corporation functioned in every particular, and paid dividends on its stock during its entire existence of twenty-four years, and until it was legally dissolved in 1940. To say that no actual and legal corporate entity was created and subsequently dissolved, is directly and conclusively contested by all of the facts.

But there seems to be an additional reason which would prevent the application of the principle relied upon.

The validity of the formation and existence of the "Estate Corporation" is only material in ascertaining the intent of Joseph Bancroft when he made his will in 1931. Its existence as a separate corporation, or merely as an agency, is only to be considered as he himself considered it when he made his will. It had been formed in 1916, and for fifteen years he had been a director and president. The Estate Corporation held personal obligations of Joseph Bancroft (collateral loans) on which interest was duly paid, and the principal eventually discharged. The Estate Corporation made sale of a portion of the real estate held by it, and upon redemption or sale of its other assets the corporation reinvested such proceeds; it paid dividends to its stockholders, and while the record is silent as to the payment of income taxes upon its activities, yet it does not appear that this burden was paid by the individual stockholder. There is nothing to indicate that from the formation of the Estate Corporation in 1916 until Joseph Bancroft's death the corporation did not function under his management, as a complete independent entity exercising entire corporate control over all of its assets.

There is nothing to indicate that Joseph Bancroft, during his life, or any other incorporator or stockholder of

the Estate Corporation ever considered it in any light other than as a separate and distinct corporate entity owning the assets it purported to hold.

Under all of the circumstances of the case, and unless we are prepared to modify rather than construe the will, we are forced to hold that the words "stock of the Joseph Bancroft Company that I may own" applied to the stock owned by the testator, and did not apply to stock not owned by him, but owned by a corporation in which he held stock.

The decree of the Chancellor must be affirmed.

LAYTON, C. J., and RICHARDS, J., dissented.

LAYTON, Chief Justice (dissenting) :

Joseph Bancroft made and executed a last will and testament on May 14, 1931, which, upon his death on May 6, 1936, was duly proved and allowed.

Item 10 of the will created a trust of the residue of the testator's estate for the sole benefit of his wife, Elizabeth H. Bancroft, for her life, with Wilmington Trust Company as trustee. This item proceeded to declare that,

"Upon the death of my said wife, in further trust to transfer convey unto my nephew, Samuel B. Bird, if he is then living, all the stock which I may own in Joseph Bancroft and Sons Company. * * * In further trust, upon the death of my said wife, all the rest, residue and remainder of said trust property and estate, to assign, transfer and convey unto Wilmington Society of Fine Arts * * * to use to establish and maintain a suitable memorial in memory of my father and mother."

Item 12 of the will gave the trustee a broad power of sale with the limitation that

"The said trustee shall not sell or dispose of my stock in the Joseph Bancroft and Sons Company without the consent of my nephew, the said Samuel B. Bird, and if such stock shall be so sold, the proceeds received therefrom shall upon the death of my said wife be paid unto my said Nephew."

Elizabeth H. Bancroft died on October 28, 1941. The trust then terminated, and the trustee was under duty to make distribution of the trust estate.

At first view the trustee's course was clear. Reading the language of Item 10 literally, and apart from any extrinsic circumstance, the intention of the testator was not doubtful. The words descriptive of the Bancroft Company stock given to the testator's nephew was "all the stock which I may own." The trust was created by the testator for the sole benefit of his wife for life. It was the property in the trust at the death of the wife that was to be distributed at her death. In the trust at that time were certain shares of stock of the Bancroft Company, and all of it was identified with and traceable to the testator. The testator's nephew was alive. There were in existence property and a beneficiary fitting precisely the dispositive language of the will. If there had been nothing before the trustee, or later before the court, except the will, the facts that the widow was dead, the nephew alive, and a list of the trust assets, all of the Bancroft Company stock held in the trust must necessarily have been delivered or awarded to the nephew. Without extrinsic evidence there would have been no basis for the award of any of this stock to the Fine Arts Society; and its claim to a part of it was necessarily dependent upon facts outside the will.

The trustee knew, of course, how the Bancroft Company stock had come into its possession, and conceiving it to be doubtful whether some of the stock was intended to go to the nephew, filed a bill of instructions alleging, *inter alia;* that Joseph Bancroft, at the time of his death, was the registered owner of 300 shares of the preferred and 5000 shares of the common stock of the Bancroft Company, and the legal owner of 4 shares of stock of a corporation known as "Estate of Samuel Bancroft Jr., Incorporated"; that this corporation, hereafter referred to as the Estate Corporation, was the legal owner of 1772 shares of the preferred

and 23,300 shares of the common stock of the Bancroft Company; that upon Joseph Bancroft's death, his executors transferred to the trustee the shares of the Bancroft Company of which he was the registered owner, and also 859 shares of the preferred and 100 shares of the common stock of the Bancroft Company, and 2 shares of the Estate Corporation stock which, subsequent to Joseph Bancroft's death, had been transferred and delivered to them by the surviving executrix under the will of Mary Bancroft, the testator's mother, who died in 1933; that by the transfer to the trustee of the 6 shares of the Estate Corporation, it became the owner of one-half of all of the stock of that corporation; that of the other half, or 6 shares, Elizabeth R. B. Bird owned 4, and the trustee under the will of Mary R. Bancroft owned 2 shares for the benefit of Elizabeth R. B. Bird, as life tenant; that the Estate Corporation was dissolved on July 1, 1940, and its assets were distributed in proportionate shares to its stockholders, and as a result, one-half of the shares of the Bancroft Company owned by the Estate Corporation, that is, 886 shares of the preferred and 11,650 shares of the common were transferred to the trustee.

The facts alleged were admitted by the appellant's answer and he offered other extrinsic evidence with respect to testamentary intention which may be summarized as follows:

The testator, a layman, wrote his own will;

The appellant is the sole heir at law of the testator;

The appellant went into the employ of the Bancroft Company in 1925 at the testator's desire, and has been connected with it ever since;

Upon the death of Samuel Bancroft Jr., the testator's father, the Estate Corporation was organized to "hold, manage and dispose of the real and personal property lately belonging to" the deceased. The authorized capital stock

was 3000 shares of the par value of $100.00. Only 12 shares were ever issued, four each to the testator, his mother, and his sister, Elizabeth R. B. Bird, and these shares were never paid for. The net assets of the estate of Samuel Bancroft, Jr. amounting to about $2,000,000.00, were transferred to the Estate Corporation with no issuance of capital stock to reflect their value. No property or assets ever came into the Estate Corporation other than the assets of the deceased, and from reinvestments of principal derived from the sale of those assets. The testator became president of the corporation upon its organization, and remained president until his death. The testator always managed the financial affairs of the corporation as though he owned it, the other directors never taking an active part therein; and at the very beginning the testator was authorized by resolution of the board of directors, consisting of himself, his mother and sister, to vote any shares of stock held by the corporation until further order of the board. From time to time he bought, both for himself and the corporation, the common stock of the Bancroft Company and neither he nor the corporation ever sold any, and as a result at the testator's death, the holdings of the common stock by himself and the corporation had materially increased. The testator had great pride in the Bancroft Company, and regarded it as the chief interest in his life. He wanted to acquire control of the company, and to that end had entered into negotiations with certain of his cousins who owned large amounts of the stock with the view of buying them out, but these negotiations eventually broke down. He discussed with the appellant his plans for the eventual control of the corporation by himself and by the appellant as his successor;

In 1929 the testator formed the design to dissolve the Estate Corporation, and was active in pursuing the design down to the time of his death, but was always faced with the large amount of unproductive real estate which the

corporation owned, and the difficulty in selling it, or making an equitable division of it among the three stockholders;

The testator declared that he wanted all of the Bancroft Company stock which his father had control of or that the appellant or his mother had anything to do with to be kept as a unit, so far as possible, so that all of that stock might be kept on his father's side of the family;

The testator evidenced great interest in his nephew's progress in the Bancroft Company, and in a conversation with the vice-president, in manifesting that interest and his concern that his nephew continue in the company's employ, said that it was a family situation and should always continue that way, as some day Sam (meaning his nephew) would have all the interest of the testator's father's side of the family, and that it was important for his nephew to continue in the employ of the company so that he would be able to look after that interest intelligently.

It is the paramount duty of the court in construing a will to ascertain from its language, as applied to the subject matter and read in the light of admissible surrounding circumstances, the intent of the testator, and give it effect unless forbidden by some rule of law or public policy. It is agreed that where the language of the will is clear, definite and incapable of any other meaning than that conveyed by the words used, there is no occasion for construction; which is to say that, if the testator has clearly expressed one intention, the courts cannot impute to him another, or substitute their discretion for his, or devise a plan of disposition which might be thought was or would be in accordance with his wishes. The form of the will, however, should be subordinate to its substance. The testator's intention need not be declared in express terms. It is sufficient if it can be clearly inferred from the general scope and import of the language used; nor need the inference of intention be irresistable, or such as to exclude all possible doubt. A reason-

able probability is sufficient. *In re Conley's Estate*, 197 Pa. 291, 47 A. 238.

Courts are bound in construing a will to find, if possible, a rational scheme of disposition, and if found from an examination of the whole instrument, words may be supplied, language changed or moulded, and the testator's intent will not be allowed to fail for want of an exact word or apt phrase. *Bradbury v. Jackson*, 97 *Me.* 449, 54 *A.* 1068; *Fuller v. Fuller*, 84 *Me.* 475, 24 *A.* 946; *Marvin v. Peirce*, 84 *N.H.* 455, 152 *A.* 484; *Seligman v. Seligman*, 89 *Misc.* 194, 151 *N.Y.S.* 889. In other words, where it is necessary to give effect to the intention of the testator courts will depart from the strict wording of the will, even though to do so involves the rejection of the literal meaning of particular words; and so, if it is apparent that words of settled meaning were intended to be used in other than their ordinary sense, the intent must prevail and the words interpreted in harmony with the intention. *Herbert v. Central Hanover Bank & Trust Co.*, 131 *N. J. Eq.* 330, 25 *A.* 2d 7; *Walker v. Thomas*, 64 *App. D.C.* 148, 75 *F.* 2d. 667, 99 *A.L.R.* 713; *Security Trust & Safe Deposit Co. v. Lockwood*, 13 *Del. Ch.* 274, 118 *A.* 225.

What a testator means by his will read in the light of the circumstances surrounding him when it was written seems to be a question of fact. If the intention appears unequivocally on the face of the will, there is no occasion to seek further in order to discover it. What is really meant is that the problem of construction is simple and easy; but whether the intention is hard or easy to determine, the ascertainment of it is construing the will, and all sources of information which may be of aid in ascertaining the intention must be used. When it is said that the court will consider the surrounding circumstances only if the language of the will is ambiguous or obscure, the question at once arises, how can it be told whether a will is clear and definite

or uncertain and ambiguous until the surrounding facts are known? 2 *Page on Wills*, (*Lifetime ed.*) *Ch.* 22.

Interpretation is concerned with the sense of the words used, and words, even in the simplest cases, require interpretation, for they must be "translated into things and facts." The process of interpretation inherently means the ascertainment of the association between words and external objects; and since a will is to be read in the light of the surrounding circumstances, free resort to extrinsic things for the purpose of applying and enforcing the document is made inevitable, and, therefore, all the circumstances must be considered which serve to make clear the sense of the words used. In the field of wills, as distinguished from that of contracts, where there is none but the individual standard of meaning to be considered, this principle is seen in unrestricted operation. 28 *R.C.L.* 268, 9 *Wigmore, Evidence,* (*3d ed.*) 227, 228. In the language of Blackburn J. *in Grant v. Grant, L.R.* 5 *C.P.* 727,

"The will is the language of the testator, soliloquizing if one may use the phrase, and the Court in construing his language may properly take into account all that he knew at the time, in order to see in what sense the words were used."

With reference to every dispute respecting which it can be shown that a knowledge of extrinsic facts can aid in the right interpretation of the will, parol evidence of the facts and circumstances surrounding and concerning the testator, his property, and the claimants of his bounty, at and before the making of the will, is admissible in evidence not to add to, vary or contradict the meaning of the will, but to enable the court to place itself in the situation of the testator, see the things as he saw them, and apply his language as he understood and intended it. See note, *Ann Cas.* 1915*B*, 12. And, if the court refuses to consider the surrounding circumstances, it declines to place itself in the position in which the testator was when he used the language which the court is trying to construe; and the

meaning which is thus ascertained is very likely to be different from the meaning which the average testator would have had in like circumstances. 2 *Page, supra,* 815.

It is accepted that extrinsic evidence is not admissible to show that the testator meant one thing when he, in fact, said another, or to show an intention not expressed in the will itself, or to aid in making a will which the testator may have intended to make, but did not make. The undoubted rule is that while resort to parol evidence is never permitted to add to or take from wills yet such evidence is not only competent but, indeed, necessary to explain or make certain the language or terms which the testator has used in their application to the objects and subjects mentioned in the will. 28 *R.C.L.* 270; *Sussex Trust Co. v. Polite,* 12 *Del. Ch.* 64, 105 *A.* 375.

At the time the will was made and at the time of the testator's death, he was the registered owner of certain shares of the Bancroft Company stock, and, consequently, the legal owner of the shares in the fullest sense. After his death, his executors received from the estate of his deceased mother (who had predeceased the testator) certain other shares of the stock. These shares had never been transferred to the testator in his lifetime, and he never had exercised dominion over them. After the testator's death, but before the death of his widow, by virtue of the testator's ownership of stock in the Estate Corporation, there came into the possession of the trustee, upon the dissolution of that corporation, certain other shares of the stock. All the Bancroft Company stock held by the trustee was, therefore, identified with and traceable to the testator by legal ownership, equitable ownership and beneficial ownership.

It was upon the allegation in the bill of these extraneous facts that what upon the face of the will was clear and definite, became ambiguous and uncertain; and it was when the trustee, in preparing to distribute the principal of the

trust, attempted to fit the language of the will to the stock in its possession that the ambiguity arose. The ambiguity, latent in character and not discoverable in the language of the will, was bared in the only way possible, that is by extrinsic evidence, for the averments of the will were no more than evidence of extrinsic facts. Such an ambiguity, if removable at all, must be removed by extrinsic evidence. *Mann v. Mann*, 14 *Johns*, 1, 7 *Am. Dec.* 416; *Decker v. Decker*, 121 *Ill.* 341; 12 *N.E.* 750; 6 *L.R.A.(N.S.)* 954; 94 *A.L.R.* 51. As said in *Daugherty v. Rogers*, 119 *Ind.* 254, 20 *N.E.* 779, 781, 3 *L.R.A.* 847,

"Whenever, therefore, in applying a will to the objects or subjects therein referred to, extrinsic facts appear which produce or develop a latent ambiguity not apparent upon the face of the will itself, since the ambiguity is disclosed by the introduction of extrinsic facts, the court may inquire into any other material extrinsic fact or circumstance to which the will certainly refers, as well as to the relation occupied by the testator to those facts, to the end that a correct interpretation of the language actually employed by the testator in his will may be arrived at."

The evidence offered by the appellant was tentatively admitted, but later rejected.

In the course of his opinion the Chancellor said "The question is not what the testator meant to say, but what he did say"; and he concluded:

"No real ambiguity in the language of the bequest satisfactorily appears either from the declarations, or otherwise, and the words used must, therefore, be given their ordinary meaning. The use of the words 'my stock' in item 12 tends to corroborate that conclusion. Substantially all of the evidence, tentatively admitted at the hearing, must, therefore, be disregarded and stricken out. Proof of ambiguity is essential before additional proof of identity can be admitted or considered."

With deference it is submitted that the question is not as put by the Chancellor, "not what the testator meant to say, but what he did say," but rather what he meant by what he said. The words descriptive of the Bancroft Company stock given to the nephew were "all the stock which

I may own." It is not disputed that if the evidence discloses that there is such a person or property, as the case may be, which corresponds to the name or description given in the will, *and the language of the will is clear in its application to external facts,* the will is not ambiguous. 2 *Page, Wills, supra,* 673. But the question immediately arises, are the descriptive words clear in their application to external facts, that is, the Bancroft Company stock in the trust estate awaiting distribution? If every word had only one meaning and was incapable of being used or understood in any other sense, there would be no need for the introduction of extrinsic evidence. But language is far from having such certainty and, therefore, the necessity that in order to interpret it the court should understand all the circumstances in which and in reference to it was used. *Gould v. Chamberlain,* 184 *Mass.* 115, 68 *N.E.* 39.

The word "all" is definite enough. It is defined in Webster's New International Dictionary as "the whole quantity, extent, duration, amount, quantity or degree"; in Funk and Wagnalls Standard Unabridged Dictionary, as "the utmost possible." A more comprehensive word is not to be found in the English language. *In re Nelson's Estate,* 152 *Misc.* 245, 273 *N.Y.S.* 268. The auxiliary verb "may" comprehends possibility, probability or contingency. 39 *C.J.* 1392; *Black's Law Dictionary* (3d ed.) 1171. The word "own" is not a technical word, or word of art, conveying a fixed and definite meaning but is a general word used both colloquially and in the law to describe a great variety of interests in property, varying in significance according to the subject matter and context. It is a word of common parlance to be construed liberally. 46 *C.J.* 1164; 28 *A. & E. Ency. Law* 234.

The descriptive language of the will was not clear in its application to external facts. The ambiguity remained to be resolved.

But in the learned Chancellor's view there was no am-

biguity at all. It is not altogether clear what was meant by some of the language used, but it is quite clear that he said that the word "own" must be given its ordinary meaning, whatever usual or ordinary meaning a word of varying significance may have; and the conclusion seems to have been that while the word "own" would certainly be descriptive of Bancroft Company stock of which the testator was the registered owner, and could be expanded to embrace stock to which he had title recognized in equity if that was the testator's intention (and the testator's intention as to this stock seems to have been accepted) yet by no possibility could the meaning of the word be stretched far enough to include stock of which the testator was the beneficial owner; although he admitted that, in a general and liberal sense, statements are sometimes made that shareholders in a corporation are the real equitable owners of any property held by it, citing his own opinion in *State ex rel. Miller v. Loft, Inc.,* 4 *W. W. Harr.* (34 *Del.*) 538, 156 *A.* 170. This statement, he said, was not strictly correct, for, until legally dissolved, a corporation is the absolute owner of all its property. It would seem, therefore, that while a jurist will be accorded some descriptive latitude in referring to the quality of interest a shareholder has in the property legally owned by the corporation, the same indulgence will be denied a layman writing his own will. So the conclusion was that as the word "own" could not be expanded to embrace beneficial ownership of stock in a family corporation, there was no ambiguity, and the learned Chancellor resolutely shut his ears and closed his eyes to all evidence with respect to the sense in which the testator, a layman, probably used the word, and struck out substantially all of the evidence with respect to the testator's intention tentatively admitted; and substantially all means all of the evidence.

Again, with deference, it may be suggested that the use of the words "my stock" in item 12 does not corroborate the conclusion reached as to the significance to be given

to the word "own". The presumption would be, in the absence of anything to indicate otherwise, that the testator used the phrase in item 12 in the same sense as the phrase in item 10.  28 *R.C.L.* 222.

The extrinsic evidence produced by the appellant, but later disregarded and stricken out, remains to be considered.

The testator, a layman, wrote his own will.

This was an admissible evidentiary fact; for if a will is drawn by one who is not a trained lawyer, the court will be more inclined to assume that the will is written in the language of the layman, and will regard the language of the will as used in its popular rather than in its technical meaning.  2 *Page, supra,* 822.  In other words, technical accuracy is not expected of a layman; and it is no answer to say that this fact is usually admitted to show the understanding, or non-comprehension, of problems with reference to the use of technical legal terms, and that there are no such terms used here.  The question here is the meaning probably in the mind of the testator in his use of the word "own" as applied to his variety of interests in Bancroft Company stock, and recognition of the rule of construction assumes an importance in its application to the nature and purpose of the Estate Corporation.

The testator had no children, and no brothers, and but one sister.  The appellant is the only child of this sister, and was, therefore, the testator's only heir and only descendant of his father's side of the family.

Every reasonable construction must be in favor of the heir at law; and he can be disinherited only by words which produce that effect clearly and necessarily, either by express terms or by necessary implication, and any ambiguity must be resolved in his favor.  2 *Page, supra,* 854.  It is a well settled rule that where the language of the will is capable of two interpretations, that one should be adopted which prefers those of the blood of the testator to strangers.  *In*

*re Norrish's Estate,* 135 *Cal. App.* 166, 26 *P.* 2d 530; *Matter of Edie,* 117 *App. Div.* 310, 102 *N.Y.S.* 424; *In re Wood's Estate,* 321 *Pa.* 164, 184 *A.* 113. This principle has a special application in considering the following extrinsic evidence.

The relation of the testator to his nephew and his anxiety that his nephew continue his connection with the Bancroft Company. It is an undisputed rule that among the surrounding circumstances which the court will consider in construing a will, are the character and occupation of the testator, the amount, extent and condition of his property, and his relations with and disposition towards those designated as the objects of his bounty. 2 *Page, supra,* 820; *Van Gallow v. Brandt,* 168 *Mich.* 642, 134 *N.W.* 1018. No authority has been cited that would permit the court to disregard and strike out the uncontradicted evidence showing the interest the testator had in his nephew and in his continued connection with the Bancroft Company and his reasons therefor, the fact that the Bancroft Company was the testator's life work, that he always bought and never sold the stock, and that he had sought to acquire control of the company through stock ownership.

Declarations made by the testator as bearing upon his testamentary intention.

Here again the question is presented with respect to the admissibility of extrinsic evidence to resolve ambiguities in a will. In numerous cases the broad rule is laid down that such evidence is never admissible where the ambiguity is patent. Some courts reject the distinction between patent and latent ambiguities as being wholly unphilosophical and founded on a scholastic quibble of Lord Bacon. *Armistead v. Armistead,* 32 *Ga.* 597. In an extensive annotation in 94 *A.L.R.* 57, it is said that according to the better view, a more accurate statement of the true rule, extrinsic evidence is admissible to show the situation of the testator and all the relevant facts and circumstances surrounding him at the time of the making of the will;

for the purpose of explaining or resolving even a patent ambiguity. Decisions will be found holding that declarations of a testator are inadmissible to control the construction of the instrument. *Stevens v. Vancleve,* 23 *Fed. Cas. No.* 13,412, 4 *Wash. C.C.* 262. Where the description of the property, estate or interest devised or bequeathed is plain and unambiguous and there is no latent ambiguity with reference thereto, parol evidence of the declarations of the testator is inadmissible to show an intention not expressed, or to show a different intention, as to what property or what estate or interest shall pass to a beneficiary by a given devise or bequest. *Hitchcock v. Board of Home Missions of Presbyterian Church,* 259 *Ill.* 288, 102 *N.E.* 741, *Ann. Cas.* 1915*B,* 1, 23.

Notwithstanding the statement sometimes found that ambiguities may be resolved by recourse to surrounding circumstances, but not to declarations of a testator, it has been repeatedly held that the declarations or instructions of the testator as to his testamentary intentions are admissible to explain a latent ambiguity with reference to what property or what estate or interest was intended to pass by a certain devise or bequest, or where the description of the subject matter is indefinite or incomplete. See cases cited in *Ann. Cas.* 1915*B,* at pages 36, 41, 44. In the same annotation, at page 14, is the statement that such declarations or instructions are not admissible as an aid in the construction of a will except in two instances, namely, to explain a latent ambiguity, and to rebut a resulting trust arising by mere implication of law. Another annotator has said that although a number of cases lay down the broad general rule that evidence of the testator's declarations is not admissible, the better view limits the rule to cases in which there is no ambiguity, and by the great weight of authority, it is held that such declarations are admissible where there is a latent ambiguity or equivocation as to the person or property intended. 94 *A.L.R.* 275. *In Doe v. Roe,* 1 *Wend.* 541, it was said:

"In cases of latent ambiguity, I do not observe in the books any exclusion of this kind of proof, (the declarations of the testator). The cases where such declarations or instructions have been excluded are cases where there was no ambiguity at all; but an attempt was made to shew a mistake in drawing the will."

In *Hearn v. Ross*, 4 *Har.* 46, there was no ambiguity. The evidence offered was to show that by mistake a certain farm which the testator intended to devise to one of his children was omitted from the will, and that the omission was not made known to or discovered by the testator when he executed the will. The court was careful to say that parol evidence was inadmissible to add to, take from, vary or explain "a written instrument like this"; and the head-note to the case shows that the language of the court was not intended to apply to a case of a latent ambiguity. *Iddings v. Iddings*, 7 *Serg. & R.* 111, 10 *Am. Dec.* 450, is a like case. *Walter's Lessee v. Miller*, 5 *Har.* 151 is very briefly reported. There seems to have been no ambiguity whatever in the language of the will, and the case is cited in an annotation as supporting the principle that parol evidence of the testator's declarations is not admissible where the description of the property given is plain and unambiguous, and there is no latent ambiguity. See *Ann. Cas.* 1915B, 23. In *Carson v. Doe ex dem. Hickman*, 4 *Houst.* 328, it was clear from the plots and pretensions laid down by both sides that the intention of the testator as expressed by his words was clear and certain; and in the annotation just referred to, *Ann. Cas.* 1915B, at page 47, the case is cited in support of the principle that parol evidence of the testator's declarations is not admissible to explain a patent ambiguity in a will. In *Sussex Trust Co. v. Polite*, 12 *Del. Ch.* 64, 106 *A.* 54, it was expressly stated that there was no ambiguity in the will, either patent or latent. *Winkler v. Woodruff*, 21 *Del. Ch.* 147, 150, 182 *A.* 409, does not purport to lay down a different rule.

It is frequently laid down that declarations of intention are receivable only to assist in interpreting an equivocation,

that is, a term which upon application to external objects, is found to fit two or more of them equally. *Darden v. Bright*, 173 *Md.* 563, 198 *A.* 431. But the annotator in 94 *A.L.R.* 280, observes

"The highly technical rule distinguishing between what is strictly known as an equivocation and the broader connotations of latent ambiguity or inaccuracy in the designation of the subject or object of a devise has not been strictly followed, even in England. And this limitation on the admission of the testator's declarations was never adopted or followed in the United States, although some lip service had been rendered to the theory of the distinction from time to time. As amply demonstrated by the cases cited above, the American courts have generally admitted declarations to resolve latent ambiguities as the beneficiaries or the property devised, without regard to whether or not there was technically an equivocation."

The following decisions are a few of the many which show a departure from the strict rule. In *Wadsworth v. Ruggles*, 6 *Pick.* 63, a testator bequeathed to his wife "all rents in arrear on her real estates." Memoranda written and signed by him were admitted to show that he included in those terms, not only rents unpaid by the tenants, but all the moneys he had ever received for rent or otherwise, belonging to his wife, with interest, the court holding that the words "rents in arrear" were used in an untechnical and artificial manner. In *Daugherty v. Rogers*, 119 *Ind.* 254, 20 *N.E.* 779, 3 *L.R.A.* 847, the testator bequeathed to a young man whom he had raised "in addition to what I have already given him, the further sum of five hundred dollars." Among the assets of the estate were notes aggregating about $6000.00 signed by the legatee, and upon which he had regularly paid the interest. Declarations of the testator were admitted which tended to show the testator highly regarded the young man, that he had furnished him with money with which to engage in business and had taken notes for it, but that he did not intend that the notes should ever be paid. In *Heywood v. Heywood*, 92 *Neb.* 72, 137 *N.W.* 984, the scrivener was allowed to testify with respect to statements made by the testator with respect to the acre-

age of a farm in a certain township devised to two of his sons.

Upon the general question of admissibility of extrinsic evidence to resolve ambiguities in a will, the course of decisions had been marked with uncertainty and vacillation, and, perhaps, inevitably so, for the courts are torn between a desire for uniformity and adherence to legalism and a plain duty to discover in every case the testator's intention and to carry it into effect unless prevented by some absolute rule of law or public policy. Almost necessarily, the contrariety of opinions make it difficult to say what is the established rule. *Holmes v. Holmes,* 36 *Vt.* 525; and as said by Professor Thayer (*Preliminary Treatise on Evidence,* 390) "Few things are darker, or fuller of subtle difficulties." But here, upon examination, it will be seen that the testator's declarations produced in evidence are not at all direct expressions of intention. The declarations do not refer to the will, or to any expression in it. They are unconnected with any general declaration or wish expressed by the testator. They do not purport to change, vary or add to the language of the will. They do not enter into competition with the words of the will, but are only interpretive of them. The declarations are rather evidence of the circumstances by which the testator was surrounded, that is to say, evidence of his attitude of mind toward his nephew and the Bancroft Company stock which was the subject of disposition, although in a sense, but incidentally, they are suggestive of intention. *In re Lummis,* 101 *Misc.* 258, 166 *N.Y.S.* 936; *Gould v. Chamberlain,* 184 *Mass.* 115, 68 *N.E.* 39. In *Sussex Trust Co. v. Polite, supra,* it was said that evidence of declarations or acts is always admissible as to the state of the testator's property, and his purpose in acquiring it, as distinct from evidence of his declarations as to the meaning of the words in his will; and the declarations here come within those categories. The statements throw light upon the word "all" and the ambiguous term "may own." They evidence the testator's purpose to keep intact the

Bancroft Company stock on his father's side of the family, and were admissible as making persuasively improbable any intention on the testator's part to have the larger part of the stock identified with him though the Estate Corporation pass to a stranger to his blood.

The organization of the Estate Corporation, its nature and purpose. It appears from the charter of the corporation that it was organized for the express purpose of holding, managing and disposing of the real and personal property of the testator's father. It was always directed and managed by the testator. No property or assets ever came into the corporation other than the assets of the deceased father and from investments of principal derived from the sale of those assets. It is, of course, true that artificial personality is a corporate attribute, and, ordinarily, the distinction between the corporation as a legal entity and its members will be preserved. It is accepted that the corporation is the legal owner of its property and that shares of stock in a corporation do not vest the owner of them with any legal right to any part of the corporate property. But it is equally to be accepted that a corporation is created by persons who associate themselves pursuant to a law; and the stockholders, or members, have an equitable interest in the corporate property, and are the ultimate owners of its net assets in whatever form they may assume. Whether or not the statements sometimes made, that the shareholders of a corporation are the real equitable owners of any property held by it is strictly correct, is somewhat beside the point; for the question here is the sense in which the testator used certain words in his will, and it is not to be answered by the legalistic argument that the Estate Corporation functioned as a corporation for some years, that the property of the Corporation was subject to the control of its board of directors, that the testator's death did not terminate the authority of the corporation to carry on its business, distinctions between a clear equitable title on one hand and a beneficial interest on the other, and that the

testator did not own or have any title, as such, to the assets of the Estate Corporation. Legalistic conceptions ought not to be allowed to defeat the testator's clear intention if it is practical to carry the intention into effect, and impractically has not been demonstrated. A corporation, from one point of view, may be considered an entity without regard to its shareholders, yet the fact remains that it is not in reality a person or thing distinct from its consistent parts; and if any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until a sufficient reason to the contrary appears. *United States v. Milwaukee Refrigerator Transit Co.*, (7 *Cir.*) 142 *F.* 247, 255. A growing tendency is shown by the courts to look beyond the corporate form for the purpose of it. *J. J. McCaskill Co. v. United States*, 216 *U.S.* 504, 30 *S. Ct.* 386, 54 *L. Ed.* 590. If the corporate entity may be disregarded where it serves to protect fraud, defend crime, or justify wrong, there appears no sufficient reason why a corporate entity created solely for a family purpose should serve to defeat the clear intention of the testator. If, for example, the testator had referred by apt phrase to his interest in the Bancroft Company stock held by the Estate Corporation, it will not readily be supposed that a court of equity would find itself powerless to carry into effect the testator's intention notwithstanding the theory of corporate entity and ownership. Again, if the testator had owned in a legal sense no Bancroft Company stock, the only stock identified with him being that held by the Estate Corporation, and wrote the will precisely as he did, it would be difficult to suppose that a court of equity would allow form to prevail over substance and confess itself helpless to overcome the legalistic conception of a corporation. And, if the Estate Corporation had been wholly owned by the testator, his intention could, and doubtless would, have been given effect by regarding the substance rather than the form of the gift. *In re Bush's Estate*, 124 *Misc.* 674, 209 *N.Y.S.* 776; *Fidelity Union Trust Co. v. Roest*, 113 *N.J. Eq.* 368, 166

*A*. 918, 921. It is said without explanation that different principles may apply to wholly owned corporations; but it would seem that the same conception of fairness and common sense would apply as well to a purely family corporation as to a corporation owned wholly by one individual. In each case the purpose of the corporation should be regarded. In each case inquiry should be made into practical difficulties that would require the corporate entity to be preserved, as perhaps, the rights of creditors or third persons generally. But a family corporation such as the one here differs very little from one owned entirely by an individual. In *Virginia Securities Corporation v. Patrick Orchards,* (4 *Cir.*) 20 *F*. 2*d* 78, 82, a family corporation was involved, yet the court very properly said that a court of equity would look at the substance rather than the shadow.

The Estate Corporation was created by the widow and two children of Samuel Bancroft Jr. Assets of about $2,000,000.00 were transferred to it without consideration. Shares of stock reflecting the value of the assets were not issued, and the twelve shares, issued apparently to constitute corporate form, were never paid for. It is entirely clear that the corporation was formed as a convenient instrumentality or agency to hold the legal title to and dispose of the real and personal property of Samuel Bancroft Jr. and nothing more. *United States v. Brager Building & Land Corporation,* (4 *Cir.*) 124 *F*. 2*d* 349. A gift to the corporation was not intended, and the corporation held only the bare naked legal title to the property transferred to it. It is not suggested that the rights of creditors were involved or that any interest or that the interest of any stockholder, would be endangered or infringed upon by a retransfer of the assets. In such circumstances there appears to be no reason why such retransfer could not have been demanded by any one of the stockholders. The undoubted principle that the members of a corporation are the equitable or beneficial owners of the corporation's assets applies in marked force, and renders it probable that the

testator looked upon his proportion of the Bancroft Company stock held by the Estate Corporation as stock owned by him.

If the word "own" was intended to be embracive of the testator's beneficial interest in the Bancroft Company stock held by the Estate Corporation, the second contention advanced by the appellant need not be considered; but the appellant strongly urged that the problem was simplified because of the fact that at the time the testator intended his will to speak, namely, as of the death of his wife, the disputed Bancroft Company stock actually formed a part of the trust estate which was then to be distributed.

It was conceded by the Chancellor, and not disputed here, that a will speaks as of the time the testator intended it should speak. *Harris v. Harris,* 97 *N.J. Eq.* 190, 127 *A.* 108. But the majority of the court approve the view taken by the Chancellor that, in the absence of some provision indicating a contrary intent, a will speaks as of the time of the testator's death, and no contrary intent appears in the will under consideration. Here, again, substance is subordinated to form, and extrinsic evidence showing the testator's intention is disregarded. It is quite true that the time of speaking is not expressed in words; but reading item 12 with item 10, and entirely apart from extrinsic circumstances, it is reasonably clear that the testator intended his will to speak as of the time of his wife's death. Distribution of the trust estate was directed to be made upon the death of the wife. The language of the gifts to the nephew and the Fine Arts Society is interwoven with that event. There are no qualifying words, and the reasonable view is that the testator had in mind the trust assets as they existed at the time fixed for distribution. The testator, in item 10, was careful by express words to mark the death of his wife as the time when the bequest of Bancroft Company stock to the nephew was to take effect, and, likewise by express words, when the rest and

residue of the trust estate was to be delivered to the Fine Arts Society. The nephew is associated solely and expressly with Bancroft Company stock, the Fine Arts Society with all else. In item 12, the testator, again speaking of the trust, provided expressly that the trustee should not sell his stock in the Bancroft Company without the consent of his nephew, and further, that if such stock should be sold, the proceeds received therefrom should, *upon the death of his wife,* be paid to his nephew. Again there are no restrictive or qualifying words, and so far as concerns words the reference is to the stock in the trust estate; and, to understate the case, it would be most doubtful that the trustee would have assumed to sell any of the stock received by it as a result of the dissolution of the Estate Corporation without the nephew's consent. The presumption that the testator intended his will to speak as of his death is not a conclusive presumption in the absence of express words indicating the contrary; and intention in this aspect of the case, like testamentary intention generally, need not be declared in express terms, nor need the inference of intention be irresistible or beyond any possible doubt. It is also important to be mindful of the rule of construction that whatever of doubt there may be should be resolved in favor of the heir at law.

When the extrinsic circumstances are considered, as they should be, all reasonable doubt as to the testator's intention is dissolved. The circumstances need not be repeated; it is sufficient to say that it is difficult if not impossible, to believe that the testator intended the Bancroft Company stock with which he was identified to be broken up and the larger part of it pass to strangers. The majority, putting aside as inadmissible, or disregarding, other extrinsic circumstances, emphasize the point that the surrounding circumstances legitimately bearing upon the matter of testamentary intention are confined to those circumstances that existed at the time the will was made, and that subsequent events or circumstances not clearly anticipated or known

to the testator cannot be considered; consequently it is said, the dissolution of the Estate Corporation in 1940 was not such a surrounding circumstance as to be entitled to consideration in arriving at the testator's intention. The statement of the rule in the abstract is not disputed; but here again is displayed the same uncompromising refusal to search for and carry into effect the testator's intention that has been seen in every phase of the controversy. Motives which may reasonably be supposed to influence a testator in the disposition of his property are entitled to consideration in ascertaining his meaning. 28 R.C.L. 272. A surrounding circumstance need not be a fact or an event. It may consist of a settled idea, a fixed attitude of mind. The uncontradicted evidence was that in 1929 the testator formed the design to dissolve the Estate Corporation, was active in pursuing it down to the time of his death, but was always faced with the difficulties arising from the large amount of unproductive real estate held by the corporation. The design or intention was a circumstance in which the testator lived and moved. To say that the design to dissolve the Estate Corporation, the possibility of its dissolution at some future time, was not a circumstance is to reject the uncontradicted evidence, and, in effect, is to say that only tangible facts, as distinguished from attitudes of mind, constitute surrounding circumstances. There is nothing in the record to indicate that the testator was in failing health or apprehensive of death, and the fact that he made no suggestion to the trustee with respect to a dissolution of the Estate Corporation is utterly immaterial.

The question is how the testator, as a layman, would, with reasonable probability, regard the Bancroft Company stock held by the Estate Corporation; and it is entirely reasonable to suppose that he would think and speak of his interest in or share of such stock as stock owned by him, and that in writing his will he, as a layman, used the words "all the stock which I may own" as embracive of all Bancroft Company stock traceable to him.

Upon the theory that the language of the will, as applied to the property mentioned in it, was ambiguous, it was necessary to travel out of the will itself and consider *all* of the surrounding circumstances which would tend to make clear the sense of the testator's language, and entering fully into the atmosphere of his surroundings and considering all that he knew at the time he wrote his will to ascertain, not what he meant as distinguished from what his words express, but what he meant by the words he used, it is entirely clear that he did not intend to scatter the Bancroft Company stock with which he was identified in ownership; and a plain, simple and wholly reasonable and understandable testamentary plan is found by which the testator's wife was to enjoy the entire income from the trust estate for her life; the nephew, the sole heir at law of the testator to take all of the Bancroft Company stock of which the testator was the legal, equitable or beneficial owner; and all else, the far greater part of the trust estate to go to the Fine Arts Society to be used for the purpose declared by the will.

The decree of the Chancellor should be reversed.

I am authorized to say that Judge Richards joins in this dissent.